UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

| | | |
|---|---|---|
| NEEDHAM & COMPANY, LLC, | : | |
| | : | |
| Plaintiff, | : | 15 Civ. 2487 (NRB) |
| | : | |
| -against- | : | **ORAL ARGUMENT** |
| | : | **REQUESTED** |
| ACCESS STAFFING, LLC, STEVE WEBER, MICHAEL | : | |
| WEINSTEIN, JOSEPH TURANO, and GLEN | : | |
| ALBANESE, | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------------------X

## THE ACCESS DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND ....................................................................................1

ARGUMENT ............................................................................................................4

POINT I.     NEEDHAM'S CIVIL RICO CLAIMS (FIRST AND SECOND CLAIMS
             FOR RELIEF) ARE TIME-BARRED.................................................4

    A. ........Needham Discovered or Should Have Discovered its RICO Injuries Prior
             to April 1, 2011, Four Years Before it Filed the Original Complaint....................4

         1. .........Needham Had Actual and Inquiry Notice of its Alleged RICO
                 Injuries Prior to April 1, 2011....................................................5

         2. .........A Reasonably Diligent Investigation Would Have Revealed
                 Needham's RICO Injuries to a Person of Reasonable Intelligence
                 Prior to April 1, 2011 ...............................................................7

         3. .........Needham's Reliance on Others Cannot Excuse its Failure to Bring
                 its RICO Claims Within the Statute of Limitations ..................10

    B. ........Needham Cannot Benefit From the Doctrine of Fraudulent Concealment...........11

POINT II.    THE CIVIL RICO CLAIMS AGAINST THE ACCESS DEFENDANTS
             (FIRST AND SECOND CLAIMS FOR RELIEF) ARE FATALLY
             DEFICIENT .......................................................................................14

    A. ........The Amended Complaint Fails to Adequately Plead a "Pattern" of
             Racketeering Activity ....................................................................15

         1. .........Closed-Ended Continuity.........................................................15

         2. .........Open-Ended Continuity ...........................................................16

         3. .........Impermissible Group Pleading ................................................17

    B. ........The First and Second Claims for Relief Fail to Adequately Plead a RICO
             Enterprise ......................................................................................18

    C. ........Access Staffing Cannot Be Held Vicariously Liable............................21

POINT III.   THE FRAUD CLAIM (FOURTH CLAIM FOR RELIEF) IS FATALLY
             DEFECTIVE AS TO THE ACCESS DEFENDANTS .........................23

    A. ........Detrimental Reliance ...................................................................23

B. ........Justifiable Reliance ................................................................................................23

C. ........Breach of Contract .................................................................................................24

CONCLUSION.................................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addeo v. Braver*,
    956 F. Supp. 443 (S.D.N.Y. 1997) ........................................................................................11

*Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*,
    483 U.S. 143 (1987) .............................................................................................................4

*Airlines Reporting Corp. v. Aero Voyagers, Inc.*,
    721 F. Supp. 579 (S.D.N.Y. 1989) ......................................................................................15

*Armstrong v. McAlpin*,
    699 F.2d 79 (2d Cir. 1983) ..........................................................................................4, 12, 13

*Ashland Oil, Inc. v. Arnett*,
    875 F.2d 1271 (7th Cir. 1989) .............................................................................................15

*Azrielle v. Cohen Law Offices*,
    21 F.3d 512 (2d Cir. 1994) ..................................................................................................14

*Austin v. Ford Models, Inc.*,
    149 F.3d 148 (2d Cir. 1998) ..................................................................................................6

*Bankers Trust Co. v. Rhoades*,
    859 F.2d 1096 (2d Cir. 1988) ................................................................................................4

*Bingham v. Zolt*,
    683 F. Supp. 965 (S.D.N.Y. 1988) ......................................................................................13

*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris*,
    113 F. Supp. 2d 345 (E.D.N.Y. 2000) .................................................................................19

*Butala v. Agashiwala*,
    916 F. Supp. 314 (S.D.N.Y. 1996) ...............................................................................12, 13

*Butala v. Agashiwala*,
    Case No. 95 CIV. 936 JGK, 1997 WL 79845 (S.D.N.Y. Feb. 24, 1997) ...............................7

*C.A. Westel de Venezuela v. Am. Tel. & Tel. Co.*,
    No. 90 Civ. 6665(PKL), 1994 WL 558026 (S.D.N.Y. Oct. 11, 1994) ............................20, 21

*Castellano v. Board of Trustees*,
    937 F.2d 752 (2d Cir. 1991) ................................................................................................25

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*,
   187 F.3d 229 (2d Cir. 1999).........................................................................................14, 15, 17

*Cruz v. FXDirectdealer, LLC*,
   720 F.3d 115 (2d Cir. 2013)....................................................................................................20

*Danann Realty Corp. v. Harris*,
   5 N.Y. 2d 317 (1959) ...............................................................................................................24

*de la Fuente v. DCI Telecommunications, Inc.*,
   206 F.R.D. 369 (S.D.N.Y. 2002) .............................................................................................11

*Discon, Inc. v. NYNEX Corp.*,
   93 F.3d 1055 (2d Cir. 1996), *rev'd on other grounds*, 525 U.S. 128 (1998).........................20

*Elsevier Inc. v. W.H.P.R., Inc.*,
   692 F. Supp. 2d 297 (S.D.N.Y. 2010) .....................................................................................18

*Feirstein v. Nanbar Realty Corp.*,
   963 F. Supp. 254 (S.D.N.Y. 1997) ..........................................................................................16

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
   219 F. Supp. 2d 576 (S.D.N.Y. 2002), *aff'd sub nom. First Capital Asset
   Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) .................................................25

*First Capital Asset Mgmt. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)...............................................................................................16, 25

*Fisher v. Reich*,
   Case No. 92 CIV. 4158 (MBM), 1995 WL 23966 (S.D.N.Y. Jan. 10, 1995) ........................10

*In re Global Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003)......................................................................................11

*Greenfield v. Kanwit*,
   87 F.R.D. 129 (S.D.N.Y. 1980) ...............................................................................................13

*Griffin v. McNiff*,
   744 F. Supp. 1237 (S.D.N.Y. 1990), *aff'd*, 996 F.2d 303 (2d Cir. 1993)...............................10

*Gross v. Waywell*,
   628 F. Supp. 2d 475 (S.D.N.Y. 2009).............................................................................14, 15, 16, 17

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
   492 U.S. 229 (1989)..................................................................................................................15

*International Brotherhood of Teamsters v. Carey*,
   297 F. Supp. 2d 706 (S.D.N.Y. 2004)......................................................................................17

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
    140 F.3d 442 (2d Cir. 1998).........................................................................................25

*Ixotic AG v. Kammer*,
    No. 09-cv-4345 (NG)(JO), 2015 WL 270028 (S.D.N.Y. Jan. 21, 2015)................................19

*Johnson v. Nyack Hospital*,
    86 F.3d 8 (2d Cir. 1996)..............................................................................................14

*Koch v. Christie's International PLC*,
    699 F.3d 141 (2d Cir. 2012).................................................................................4, 5, 10

*Krantz v. Chateau Stores of Canada*,
    256 A.D.2d 186 (N.Y. App. Div. 1998) ........................................................................24

*LBBW Luxemburg S.A. v. Wells Fargo Securities LLC*,
    10 F. Supp. 3d ...........................................................................................................23

*Lefkowitz v. Bank of N.Y.*,
    No. 01-cv-6252, 2003 WL 22480049 (S.D.N.Y. Oct. 31, 2003).............................................16

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) .........................................................................................4

*Leung v. Law*,
    387 F. Supp. 2d 105 (E.D.N.Y. 2005) ...........................................................................16

*In re Libor-Based Financial Instruments Antitrust Litigation*,
    No. 11 MDL 2262 NRB, 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015)
    (Buchwald, J.) ...........................................................................................................19

*Marlow v. Gold*,
    Case No. 89 CIV. 8589 (JSM), 1991 WL 107268 (S.D.N.Y. June 13, 1991)........................10

*Medinol Ltd. v. Bos. Scientific Corp.*,
    346 F. Supp. 2d 575 (S.D.N.Y. 2004)..........................................................................16

*In re Merrill Lynch Ltd. P'ship. Litig.*,
    154 F.3d 56 (2d Cir. 1998)......................................................................................11, 12

*Mikhlin v. HSBC*,
    No. 08-CV-1302 (CPS), 2009 WL 485667 (E.D.N.Y. Feb. 26, 2009)................................22

*Moll v. U.S. Life Title Ins. Co. of New York*,
    700 F. Supp. 1284 (S.D.N.Y. 1988) .............................................................................12

*National Group for Communications & Computers Ltd. v. Lucent Technologies Inc.*,
420 F. Supp. 2d 253 (S.D.N.Y. 2006)...................................................................11

*Nortman v. Itex Energy Corp.*,
1989 WL 81921 (N.D. Ill. 1989) ........................................................................15

*O'Brien v. National Property Analysts Partners*,
719 F. Supp. 222 (S.D.N.Y. 1989) .....................................................................13

*Overall v. Estate of Klotz*,
52 F.3d 398 (2d Cir. 1995)..................................................................................14

*In re Prudential Sec. Inc. Ltd. P'ship Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) .........................................................................4

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) ...........................................................................................18

*Riverwoods Chappaqua Corp. v. Marine Midland Bank*,
30 F.3d 399 (2d Cir. 1994).............................................................................19, 20

*Smith v. McGinnis*,
208 F.3d 13 (2d Cir. 2000)..................................................................................14

*Thompson v. Metro. Life Ins. Co.*,
149 F. Supp. 2d 38 (S.D.N.Y. 2001)....................................................................5

*Turner v. New York Rosbruch/Harnik, Inc.*,
84 F. Supp. 3d 161, 171 (E.D.N.Y. 2015) .........................................................25

*Weizmann Institute of Science v. Neschis*,
229 F. Supp. 2d 234 (S.D.N.Y. 2002).............................................................15, 16

*Wynne v. Equilease Corp.*,
Case No. 94 Civ. 4992, 1995 WL 764236 (S.D.N.Y. Dec. 27, 1995)....................9

**Statutes**

Fed. R. Civ. P. 12(b)(6)........................................................................................1

18 U.S.C. § 1961(1) ............................................................................................14

18 U.S.C. §1961(4) .............................................................................................19

18 U.S.C. § 1962(c) ............................................................................................14

**Other Authorities**

60A N.Y. Jur. 2d Fraud and Deceit § 149 ...................................................................................23

Defendants Access Staffing, LLC ("Access Staffing"), Steve Weber ("Weber") and Michael Weinstein ("Weinstein," collectively as the "Access Defendants") submit this Memorandum of Law in support of their motion, made pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss with prejudice the Amended Complaint (Dkt. No. 40) of Plaintiff Needham & Company, LLC ("Needham").[1]

## PRELIMINARY STATEMENT

Reference is made to the Access Defendants' October 23, 2015 letter, submitted in accordance with the Individual Rules of Practice of the Honorable Naomi Reice Buchwald, Rule 2 E. 1, summarizing the substantive arguments set forth herein.

## FACTUAL BACKGROUND

From approximately 2000 to 2010, Access Staffing, Access Personnel, and Access Temporaries (the "Access Entities") provided employee staffing services to Needham, an investment banking and asset management firm. Although it preferred to hire its employees through other means to save costs (Dkt. No. 40 ¶ 13), Needham paid the Access Entities over $4 million in staffing fees throughout the parties' relationship. *Id*. at ¶ 28. Of that amount, Needham now alleges that $2,390,753 of those payments were illegitimate, as Needham's then chief financial officer, Glen Albanese ("Albanese"), and vice president of human resources, Joseph Turano ("Turano"), purportedly approved invoices for staffing services that were never rendered by the Access Defendants. *Id*. at ¶¶ 39-50. These allegedly fraudulent invoices purportedly sought payments for three categories of staffing services, i.e., "retained searches," "contingent searches," and temporary staffing at Needham's annual investor conferences. *Id*.

---

[1] The Access Defendants also join in the motion to dismiss filed by Defendant Joseph Turano, and adopt and incorporate all arguments made in his motion papers as if fully set forth herein.

Beginning in November 2010, Needham was put on notice of probable invoicing impropriety by an employee who expressed concerns about Albanese's approval of payments to outside vendors. *Id*. at ¶ 51. In January 2011, Needham retained the law firm Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. ("Mintz Levin") to conduct an internal investigation into the "invoicing impropriety," which included, *inter alia,* a review of "documents and information related to [Needham's] interactions with vendors" and interviews of "various Needham employees." *Id*. at ¶ 52; Dkt. No. 1 ¶ 34. On January 19, 2011, a Needham employee explicitly identified "potential over-charges by Access Staffing" and "expressed concern that Needham was paying too much for Access Staffing's services and that the invoices lacked sufficient detail." Dkt. No. 40 ¶¶ 58, 59. On February 3, 2011, Mintz Levin conducted a "wide-ranging interview" of Albanese, and on or around February 18, 2011, Albanese disclosed that he had submitted a false expense report and thereafter resigned from his position at Needham. *Id*. at ¶¶ 60-61, 64. With clear suspicions of invoicing impropriety involving the Access Entities, between March 5 and March 9, 2011, Needham's chairman, George Needham, interviewed Turano on *four occasions* "about various issues that had arisen during Mintz Levin's investigation," including invoicing impropriety related to the Access Entities. Dkt. No. 40 ¶ 68. Mintz Levin also interviewed Turano on March 9, 2011. *Id*. at ¶ 68.

In mid-March 2011, Mintz Levin "obtained and reviewed all of Access Staffing's invoices to Needham for the years 2009 and 2010 and found no red flags." *Id*. at ¶ 71. Remarkably, Needham fails to allege that either it or Mintz Levin reviewed *all* of the Access Entities' invoices or that it interviewed *all or even a handful* of the employees identified in these invoices. Mintz Levin finished its investigation by "mid-March" 2011, concluding that "while there was evidence of fraud by Albanese … it found no evidence of improper conduct with respect to [the Access

Entities]." *Id*. at ¶ 74.  Nevertheless, Needham instructed Turano to sever ties with all outside vendors who had worked with Albanese, including the Access Entities.  *Id*. at ¶ 66.  Needham's outside auditors, Ernst & Young ("E&Y") also conducted a truncated investigation with a "lower materiality threshold," but identified no material irregularities beyond those identified by Mintz Levin.  *Id*. at ¶¶ 76-80.

On March 24, 2011, FINRA initiated its own investigation and enforcement action against Albanese.  *Id*. at ¶ 81.  On June 14, 2011, Needham was notified that the FBI and U.S. Attorney for the District of New Jersey were also investigating Albanese.  *Id*. at ¶ 82.  In early 2012, the government informed Mintz Levin that it was investigating whether Albanese had conspired with other vendors, including the Access Entities, to defraud Needham.  *Id*. at ¶ 83.  In February 2013, Mintz Levin was informed that the government was also investigating Turano.  *Id*. at ¶ 87.  At the government's request, Mintz Levin interviewed certain current employees for whom Needham had paid placement fees to the Access Entities and "learned that [the Access Entities] had not been involved in most of these employees' hiring."  *Id*.   More than two years later, on April 1, 2015, Mintz Levin commenced the instant action.[2]  Dkt. No. 1.  The government has taken no action against the Access Defendants or Turano; Albanese's guilty plea had nothing to do with the allegedly fraudulent Access invoices.  Dkt. No. 40 ¶ 86.

---

[2] At the Court's suggestion, Mintz Levin has since withdrawn from this action due to an apparent conflict of interest.

## ARGUMENT

**POINT I.     NEEDHAM'S CIVIL RICO CLAIMS (FIRST AND SECOND CLAIMS FOR RELIEF) ARE TIME-BARRED**

### A.     Needham Discovered or Should Have Discovered its RICO Injuries Prior to April 1, 2011, Four Years Before it Filed the Original Complaint

Civil RICO actions are governed by a four-year statute of limitations which begins to run when the RICO injury is or should have been discovered by the plaintiff.  *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 156 (1987); *accord Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102-03 (2d Cir. 1988).  In the Second Circuit, a RICO claim accrues when the plaintiff had inquiry notice of its injuries, i.e., when the plaintiff became aware of the "storm warnings" indicating probable impropriety.  *Koch v. Christie's Int'l. PLC*, 699 F.3d 141, 151-53 (2d Cir. 2012) (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005)).  Where a plaintiff has inquiry notice and an inquiry is made, as was done in this case, the Court must then "determine when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence, and the statute of limitations begins to run on that date."  *Id*.  Both prongs of this test are to be evaluated under an objective standard.  *See In re Prudential Sec. Inc. Ltd. P'ship Litig.*, 930 F. Supp. 68, 75-76 (S.D.N.Y. 1996); *accord Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983).

Needham filed its Original Complaint on April 1, 2015, thereby cutting off, by operation of the Supreme Court's four-year limitations period, any RICO claims for injuries that were discovered or should have been discovered prior to April 1, 2011.  The facts alleged in the Amended Complaint demonstrate that Needham discovered or should have discovered its RICO injuries well before April 1, 2011.

### 1.   Needham Had Actual and Inquiry Notice of its Alleged RICO Injuries Prior to April 1, 2011.

The Amended Complaint demonstrates that Needham had inquiry notice of the "storm warnings" of its RICO injuries sufficient to raise a duty to inquire further, and did in fact inquire further, long before April 1, 2011.  *See Koch*, 699 F.3d at 151 (noting that "storm warnings" used to trigger inquiry notice "need not detail every aspect of the alleged fraudulent scheme," but need only suggest to a person of ordinary intelligence the probability of fraudulent activity).  Needham concedes that its suspicions were first aroused in November 2010, when "a Needham executive assistant noticed and communicated to various other Needham personnel, including senior management, potential over-charges by a third-party printing vendor called [S&R]."  Dkt. No. 40 ¶ 51.  These initial suspicions were not that the over-charges were the product of mistake, but that there was a probability of impropriety that would lead a reasonable person to inquire further.  *Thompson v. Metropolitan Life Ins. Co.*, 149 F. Supp. 2d 38, 48 (S.D.N.Y. 2001) ("[C]ourts have made clear that it is not necessary for a plaintiff to understand every permutation of his or her injury, rather the plaintiff simply needs to have a 'hint' or 'suspicion' of the injury and its cause to be put on inquiry notice.").  As a result, Needham conducted an internal investigation and later hired Mintz Levin in January 2011 to assist in its investigation of its suspected loss.  Dkt. No. 40 ¶ 52.  From January 2011 through March 2011, Needham was made acutely aware of numerous "storm warnings" that put it on inquiry notice of its alleged injuries, including, *inter alia*:

- On January 19, 2011, the executive assistant who had expressed the original concerns of invoicing impropriety raised numerous other issues including impropriety by Albanese and "potential over-charges by [the Access Entities]."  This employee also expressed concern that "Needham was paying too much for Access Staffing's services and that the invoices lacked sufficient detail."  Dkt. No. 40 ¶¶ 58-59.  Even if these concerns were the only indicia of misconduct raised in the Amended Complaint, Needham would have been on inquiry notice of invoicing impropriety by the Access Entities.

- On February 3, 2011, Mintz Levin interviewed Albanese about, among other things, his relationship with the Access Entities. Albanese allegedly described the Access Entities as a temp service which was also used as a headhunter by Needham. Dkt. No. 40 ¶ 60. But on February 18, 2011, Albanese admitted to submitting a false expense report and soon after resigned from his position as chief financial officer of Needham, thus calling into question Albanese's credibility on all subjects. Dkt. No. 40 ¶¶ 60-61, 64. At the very least, upon Albanese's resignation, Needham was put on inquiry notice that his previous assurances regarding the Access Entities were unreliable, imposing a duty on Needham to inquire further about the Access Entities' invoices.

- In response to the invoicing improprieties that had already been raised and discovered, Needham's chairman instructed Turano to sever Needham's ties with all of the outside vendors that Albanese had used, including the Access Entities. Dkt. No. 1 ¶ 42[3]; Dkt. No. 40 ¶ 66. The fact that Needham felt the need to sever ties with *all* of its outside vendors demonstrates that it was sufficiently suspicious and, thus, on inquiry notice of invoicing impropriety by all of its outside vendors, including the Access Entities.

- Needham also "tasked [Turano] with revising and implementing new purchasing procedures for Needham to ensure that vendor improprieties did not occur in the future." Dkt. No. 40 ¶ 65. Turano was told to "revamp the ways in which Needham interacted with, retained, and compensated its vendors." Dkt. No. 40 ¶ 66. Needham would have had no reason to completely overhaul its payment protocols for outside vendors unless it was sufficiently suspicious of widespread invoicing impropriety by these outside vendors, including the Access Entities.

- On March 4, 2011, E&Y questioned Turano as to his involvement with payments to outside vendors, including the Access Entities. Dkt. No. 1 ¶ 37. Between March 5 and March 9, 2011, George Needham questioned Turano on four separate occasions as to his involvement or knowledge "about various issues that had arisen during Mintz Levin's investigation, including [the Access Entities]." Dkt. No. 40 ¶ 68. On March 9, 2011, Mintz Levin questioned Turano as to potential invoicing impropriety related to the Access Entities. Dkt. No. 40 ¶ 69. The repeated interviews with Turano and their focus on the Access Entities demonstrate that Needham, Mintz Levin, and E&Y were not only suspicious of invoicing impropriety by the Access Entities, but also suspected Turano's involvement in or knowledge of that impropriety.

---

[3] In its Original Complaint, Needham states that "Needham's Chairman … instructed Turano to revise Needham's vendor payment policies and to sever ties with *all vendors that Albanese was involved with, including Access Staffing*." Dkt. No. 1 ¶ 42 (emphasis added). In its Amended Complaint, Needham papers over this admission by stating that "Needham's senior management instructed Turano to sever ties with *various vendors*, including those with which Albanese had had personal contact…." Dkt. No. 40 ¶ 66 (emphasis added). The difference between these two statements is significant because they indicate that Needham was aware or suspicious enough of pervasive invoicing impropriety that it cut ties with all of Albanese's vendors. The Court is entitled to take judicial notice of these pleadings in considering whether Needham was on inquiry notice. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998) ("The amendment of a pleading does not make it any the less an admission of the party.") (internal quotation marks omitted).

- In mid-March 2011, Mintz Levin obtained and reviewed "all of [the Access Entities'] invoices to Needham for the years 2009 and 2010," but "found no red flags." Dkt. No. 40 ¶ 71. Having supplied Mintz Levin with all of the Access Entities' invoices from 2009 and 2010, Needham was once again put on inquiry notice of invoicing impropriety related to the Access Entities.

- By mid-March 2011, Mintz Levin had identified the presence of widespread fraud in connection with improper invoicing by various outside vendors. Dkt. No. 40 ¶ 74. For instance, Mintz Levin found that "many of the invoices that Needham had paid from S&R and all of the invoices that Needham paid from Data Source were for services that were never rendered to Needham." Dkt. No. 1 ¶ 41. FINRA initiated an investigation and enforcement action against Albanese for, among other things, invoicing impropriety. Dkt. No. 40 ¶ 81. Once again, Needham was put on inquiry notice that the matters as to which Albanese had previously provided assurances were unreliable.

These facts, drawn exclusively from Needham's pleadings, demonstrate that Needham had more than ample inquiry notice, if not actual notice, of its RICO injuries before April 1, 2011. Indeed, Needham's retention of counsel to investigate suspicions of fraudulent activity alone is a highly significant fact in establishing the date of inquiry notice. *See, e.g., Butala v. Agashiwala*, Case No. 95 CIV. 936 JGK, 1997 WL 79845, at *6 (S.D.N.Y. Feb. 24, 1997) ("More importantly, by October 1990, the plaintiffs' suspicions regarding the defendants' role in the fraud had been raised to such a degree that [they] asked the attorney … whether the defendants were involved in the fraud. … Thus, the plaintiffs were on inquiry notice regarding the defendants' role in the fraud no later than October 1990….").

## 2. A Reasonably Diligent Investigation Would Have Revealed Needham's RICO Injuries to a Person of Reasonable Intelligence Prior to April 1, 2011

It is also true that a reasonably diligent investigation would have revealed Needham's purported RICO injuries prior to April 1, 2011. The Court need only look to the specific facts actually pleaded in support of the RICO injuries and the meager diligence Needham actually displayed to discover them.

For example, the largest portion of Needham's alleged RICO injuries is attributed to false Access Entities invoices for staffing Needham's investor conferences with temporary workers. Dkt. No. 40 ¶ 48.  Needham claims that these Access Entities' invoices "were false *because they were grossly inflated* in light of the number of temporary employees that had been forecast … and the number that had actually staffed the conferences."  Dkt. No. 40 ¶ 47 (emphasis added).  In other words, Needham concedes that these invoices were excessive on their face.  The only facts alleged in support of this claimed injury, however, are the invoices themselves, pleaded yet omitted by Needham.  *See id.* at ¶ 48.  Even a cursory review of these invoices shows that Needham was paying Access Staffing, on average, over $6,700 per temporary employee, or over $200 per temporary employee per hour, to fill vacancies for temporary positions that were ordinarily staffed by family and friends in order to save costs.  *See id.* at ¶ 48.[4]

Needham provides no explanation for why these facts, which serve as the basis for its largest RICO injuries, could not have been easily discovered with minimal diligence prior to April 1, 2011.[5]  In fact, the last two years of these invoices were discovered during Needham's investigation; in March 2011, Mintz Levin obtained and reviewed "all of Access Staffing's invoices to Needham for the years 2009 and 2010…."  *See id.* at ¶ 71.  Yet, in spite of their ability to review these invoices—including payments of nearly $80,000 to staff just nine temporary workers ($8,700 per temporary worker) for a three-day investor conference in June 2009 (Dkt. No.

---

[4] This hourly calculation is based on Needham's statements regarding the typical number of hours worked by temporary employees at its January and June conferences.  *See* Dkt. No. 40 ¶ 46.

[5] Needham appears to argue that it did not consult the actual invoices because of Turano's assurances, including that "Needham routinely hired over 40 temporary staff through [the Access Entities] for each of its investor conferences."  *See* Dkt. No. 40 ¶ 69.  But Needham could have verified these assurances very simply, e.g., by consulting the actual Access Entities' invoices, and a reasonably diligent investigator would have done just that.  As discussed, *infra*, while Turano told Needham that it "routinely hired over 40 temporary staff" for its investor conferences, the temporary staffing invoices from 2009 and 2010 reveal that Needham actually hired an average of just 14 temporary staff.  *Compare id.* at ¶ 69 *with id.* at ¶ 48.

40 ¶ 48, Invoice Nos. 276616A, 281574A)—and in spite of concerns that had been raised regarding "potential over-charges by Access Staffing" (*id*. at ¶ 58) and Needham's desire to "save costs" by avoiding third-party staffing charges (*id*. at ¶ 16), Mintz Levin found "no red flags." *See id*. at ¶ 71.  Needham cannot now argue that it was unable to timely discover its RICO injuries when it had unfettered access to all of the purportedly false invoices for its review at all times during its investigation of invoicing impropriety. *See, e.g., Wynne v. Equilease Corp.*, Case No. 94 Civ. 4992 LMM, 1995 WL 764236, at *7 (S.D.N.Y. Dec. 27, 1995) (dismissing the plaintiff's RICO claims as time-barred and noting that the "Court cannot comprehend how even a cursory review of the above-referenced warnings and disclaimers would not have raised 'red flags' for investors"). Similarly, Needham cannot argue that it was unaware of the alleged close personal relationships between or among the Defendants where it had access during its investigation to all of the e-mails purportedly revealing their relationship. *See id*. at ¶¶ 30-31.

The second largest component of Needham's purported RICO injuries, consisting of thirty-eight false invoices purportedly issued by the Access Entities, are described in paragraph 40 of the Amended Complaint. *See* Dkt. No. 40 ¶ 40.  These thirty-eight invoices are alleged to be false because "the employee referenced in the invoice had been hired through a source other than the Access Entities…." *Id*. at ¶ 41.  All that Needham had to do to verify the authenticity of these invoices was to question each of its current employees, or at least a small sampling of them, allegedly hired through the Access Entities.  Mintz Levin did not get around to invoking this rudimentary, but effective, investigative tactic until 2013. *Id*. at ¶ 87.  With all of the "storm warnings" of invoicing impropriety, including numerous explicit red flags related to the Access Entities, it was objectively unreasonable, if not downright grossly negligent, for Needham to forego review of the very invoices that had aroused its suspicions in the first place and which now

form the basis of its RICO claims.  *See Griffin v. McNiff*, 744 F. Supp. 1237, 1255 (S.D.N.Y. 1990), *aff'd*, 996 F.2d 303 (2d Cir. 1993) ("On a motion to dismiss, when the facts alleged in the complaint indicate that, with reasonable diligence, plaintiffs should have uncovered the alleged fraud prior to the limitations period, the claim will be time-barred.") (citation omitted).

### 3.   Needham's Reliance on Others Cannot Excuse its Failure to Bring its RICO Claims Within the Statute of Limitations

The incompetence or carelessness of Mintz Levin or E&Y does not save Needham's RICO claims from being time-barred.  The Second Circuit uses an objective standard for determining the reasonableness of the inquiry, which looks at what a "reasonably diligent investigation *would have revealed* … to a person of reasonable intelligence," not what the particular investigation revealed to the plaintiff.  *See Koch*, 699 F.3d at 151 (emphasis added).  Needham's delegation of its investigative responsibilities to a less-than-diligent law firm and forensic accounting firm would not toll the statute of limitations when even a minimally diligent investigation would have quickly revealed the facts underlying Needham's purported RICO injuries.  *See Marlow v. Gold*, Case No. 89 CIV. 8589 (JSM), 1991 WL 107268, at *9 (S.D.N.Y. June 13, 1991) (concluding that a reasonable investor cannot solely rely on the professional assurances of his accountant and must instead familiarize himself with the nature and risks of his investment); *see also Fisher v. Reich*, Case No. 92 CIV. 4158 (MBM), 1995 WL 23966, at *4 (S.D.N.Y. Jan. 10, 1995) (rejecting the plaintiffs' argument that they exercised reasonable diligence because a "reasonable investor would have read the [private placement memorandum] and familiarized himself with the potential for loss, rather than relying on the assurances of an advisor").

Needham may claim that it failed to inquire more deeply into invoicing impropriety by the Access Entities because of Turano and Albanese's reassurances.  This argument is similarly without merit based on the dubious circumstances surrounding any assurances they may have

made.  Any person of ordinary intelligence would have understood that both Albanese and Turano had a strong incentive to portray themselves as truthful, and Needham should have been cautious about accepting their assurances, especially after Albanese's resignation due to financial impropriety.  *See de la Fuente v. DCI Telecommunications, Inc.*, 206 F.R.D. 369, 381 (S.D.N.Y. 2002) (noting that the "plaintiffs have a duty to inquire into the reliability of a defendant's representations where there is information that suggests that there are any material misrepresentations.") (citations omitted); *Addeo v. Braver*, 956 F. Supp. 443, 451-52 (S.D.N.Y. 1997) ("Once plaintiffs were thereby left with reason to be suspicious of defendant, it was no longer reasonable for them to defer to his representations.").  Needham's own investigations uncovered ample evidence demonstrating widespread impropriety, which should have raised doubts about Albanese's and Turano's ongoing assurances.

In sum, a "reasonable [person] would have discovered the facts necessary to bring [the] cause of action" in this case in a timely fashion had she conducted a reasonably diligent investigation.  *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204 (S.D.N.Y. 2003). The investigation undertaken here was inadequate and careless.  But reasonable diligence is an objective test, and, therefore, Needham's RICO claims should be dismissed as time-barred.

### B.    Needham Cannot Benefit From the Doctrine of Fraudulent Concealment

Needham cannot save its time-barred RICO claims by claiming fraudulent concealment by the Defendants.  Only in "exceptional circumstances," may the doctrine of fraudulent concealment toll the RICO statute of limitations.  *National Group for Communications & Computers Ltd. v. Lucent Technologies Inc.*, 420 F. Supp. 2d 253, 264 (S.D.N.Y. 2006) (citations omitted). Moreover, a plaintiff must establish three elements to raise the claim: (1) wrongful concealment by the defendants (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim.  *In re Merrill*

11

*Lynch Ltd. P'ship. Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (citing *Butala v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996)).  Each of these elements must be pled with particularity.  *See Armstrong v. McAlpin*, 699 F.2d 79, 90 (2d Cir. 1983).  In this case, Needham has failed to sufficiently plead any of the requisite elements of fraudulent concealment necessary to toll the statute of limitations.

Here, the Amended Complaint makes no claims that the underlying fraudulent acts were of such a nature to be self-concealing.  Instead, Needham claims generally "upon information and belief" that the Defendants "repeatedly acted to conceal their fraud from Needham," by taking two actions: 1) "Weber and Weinstein [agreed to] cause [the Access Entities] not to attempt to collect on any of [its] outstanding invoices to Needham," and 2) the Defendants "agreed to make false statements in the event that Mintz Levin questioned Access Staffing's invoices…."  Dkt. No. 40 ¶¶ 2, 53, 80, 136.  Not only are these allegations conclusory and fail to plead the first element with any particularity, but they also fail to allege the sorts of "affirmative steps" necessary to plead fraudulent concealment.  *See Moll v. U.S. Life Title Ins. Co. of New York*, 700 F. Supp. 1284, 1291 (S.D.N.Y. 1988) (noting that in order to sufficiently plead fraudulent concealment, "[t]here must be [allegations of] some trick or contrivance intended to exclude suspicion and prevent inquiry.") (citations omitted).

With regard to Needham's claim that Weber and Weinstein agreed not to collect on any of the Access Entities' outstanding invoices, there are no allegations that any such invoices actually existed at the time of this purported agreement, let alone that Weber and Weinstein were even required to collect on them.  To the contrary, the purported scheme involved "Turano and Albanese [submitting] the invoice to Needham's accounts payable department with instructions to pay the invoice, knowing that a check would be issued and mailed to the relevant Access Entity…."  Dkt. No. 40 ¶¶ 38(e), 42(c), 50(e).  Further, the only semi-precise allegation of misrepresentation to

support Needham's fraudulent concealment claim consists of purported misstatements made by Turano to Mintz Levin on March 9, 2011.  Dkt. No. 40 ¶ 69.  Needham fails, however, to plead with sufficient particularity that these statements were actually statements of fact, were in fact false, were meant to be false, or were otherwise meant to conceal the alleged RICO injuries.[6]  *See* Dkt. No. 40 ¶ 69 (noting the statements described).

The second element requires that a plaintiff plead causation.  Needham's only allegation that the Defendants' concealment may have prevented the discovery of the purported RICO injuries appears in paragraph 55 of the Amended Complaint.  *See* Dkt. No. 40 ¶ 55 ("Due to Defendants' actions in furtherance of their conspiracy to conceal their fraud … Defendants' frauds remained undetected until mid-2013.").  However, this nebulous, conclusory statement fails to satisfy the heightened pleading standard for fraudulent concealment.  *See Armstrong v. McAlpin*, 699 F.2d 79, 90 (2d Cir. 1983).  Moreover, Needham fails to allege any facts demonstrating that it was unable to discover the Defendants' purported fraud *because of* the alleged fraudulent concealment.  *See Butala*, 916 F. Supp. at 320 (denying the plaintiff's fraudulent concealment argument where "the plaintiffs fail to describe how they were prevented from investigating the fraud").

Finally, with regard to the third element of fraudulent concealment, the Access Defendants have already demonstrated *supra* that Needham's failure to uncover its purported RICO injuries

---

[6] In the alternative, to the extent that the Court finds that the first element of fraudulent concealment was pled as to Turano or Albanese, Needham cannot toll the statute of limitations as to Access Staffing, Weber, or Weinstein as to whom no such particular allegations were made.  *See O'Brien v. National Property Analysts Partners*, 719 F. Supp. 222, 232 (S.D.N.Y. 1989) ("Allegations that other defendants acted to deceive plaintiffs from filing suit do not plead fraudulent concealment against all defendants."); *Bingham v. Zolt*, 683 F. Supp. 965, 975 (S.D.N.Y. 1988) ("The doctrine of fraudulent concealment tolls the running of the statute of limitations only as to those defendants who committed the concealment.") (emphasis added).  Thus, Needham may not use fraudulent concealment by one defendant as a basis for tolling the statute of limitations against another defendant who did not engage in affirmative fraudulent acts to conceal.  *Greenfield v. Kanwit*, 87 F.R.D. 129, 132 (S.D.N.Y. 1980).

was due to its lack of reasonable diligence.  Thus, Needham cannot assert the doctrine of fraudulent

concealment to toll the statute of limitations in this case.[7]

**POINT II.     THE CIVIL RICO CLAIMS AGAINST THE ACCESS DEFENDANTS (FIRST AND SECOND CLAIMS FOR RELIEF) ARE FATALLY DEFICIENT**

"To establish a claim for a civil violation of 18 U.S.C. § 1962(c), 'a plaintiff must show

that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity'." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229, 242

(2d Cir. 1999) (quoting *Azrielle v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994)).  Where,

as here, Needham's RICO claims are premised solely on mail fraud, they must be "particularly

scrutinized because of the relative ease by with which a plaintiff may mold a RICO pattern from

allegations that, upon closer scrutiny, do not support it."  *Gross v. Waywell,* 628 F. Supp. 2d 475,

493 (S.D.N.Y. 2009) (citations omitted).[8]

---

[7] For these reasons, Needham is also unable to assert the doctrines of equitable tolling or equitable estoppel.  Under the doctrine of equitable tolling, the statute of limitations is extended "as a matter of fairness where a plaintiff has been prevented in some extraordinary way from exercising his rights."  *Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (internal citation omitted).  Needham has not alleged any extraordinary conditions that justify its delay in filing the current action.  In fact, Needham has failed to allege any facts demonstrating that filing a timely action was "impossible" in this case.  *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000).  Further, Needham cannot invoke equitable estoppel where it waited over three years to file the Original Complaint after it was informed in February 2012 that the government was investigating whether Albanese had conspired with the Access Entities to defraud Needham.  *See* Dkt. No. 40 ¶ 83; *see also Overall v. Estate of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995) (noting that a plaintiff "must show that he brought his action within a reasonable time after the facts giving rise to the estoppel have ceased to be operational.").

[8] The *Gross* Court correctly recognized that unlike the other criminal offenses enumerated in the RICO statute as racketeering, use of the mail is not inherently criminal.  *See* 18 U.S.C. § 1961(1).  The alleged mailings must therefore be closely scrutinized in the context of the alleged fraudulent scheme as there may be "substantial innocent or incidental use of the mail or wires that may not relate to the [] unlawful activity of the enterprise or that involves no deception of the plaintiff."  *Gross*, 628 F. Supp. 2d at 494.  Here, the Access Defendants' alleged use of the mails was merely incidental to the alleged fraudulent invoicing scheme.  Specifically, in support of its mail fraud predicate, Plaintiff appears to allege that the Access Entities mailed the invoices to Turano who then submitted them to Needham.  *See* Dkt. No. 40 ¶¶ 38, 42, 50.  Needham, at the direction of Albanese and Turano, then mailed a check to the relevant Access entity after they approved the invoice.  *Id*.  The alleged mailings did not, however, involve any deception on Needham and they were not integral to the fraudulent scheme.  They were merely a matter of happenstance.  Indeed, the alleged unlawful activity of falsifying invoices and issuing checks could have occurred without the use of the mails.  Needham has conceded as much by pleading that the invoices were "mailed or faxed." *Id*.

A. **The Amended Complaint Fails to Adequately Plead a "Pattern" of Racketeering Activity**

To establish a "pattern" of racketeering activity, Needham must allege facts tending to show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989). "The continuity necessary … can be either 'closed-ended continuity' or 'open-ended continuity.'" *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999).

1. **Closed-Ended Continuity**

"'Closed-ended continuity is demonstrated by predicate acts that amount to continued criminal activity by a particular defendant.'" *Weizmann Institute of Science v. Neschis,* 229 F. Supp. 2d 234, 256 (S.D.N.Y. 2002) (citations omitted). "[C]ourts in this Circuit have held repeatedly that allegations of RICO violations involving solely mail and wire fraud or little other variety in the predicate acts, a limited number of participants or victims, a discrete scheme with a narrow purposes or a single property—as opposed to complex, multi-facetted schemes—are generally insufficient to demonstrate closed-ended continuity." *Gross v. Waywell*, 628 F. Supp. 2d 475, 494-96 (S.D.N.Y. 2009).

The Amended Complaint alleges a simple fraudulent invoicing scheme related to staffing services provided by the Access Entities to Needham. Dkt. No. 40 ¶ 1. The alleged scheme targeted only a single victim, Needham, for only a single, narrow purpose—to bill and be paid on fraudulent invoices. *Id.* Only four individual defendants were involved in the scheme, and the sole predicate acts alleged (*albeit insufficiently*) are acts of mail fraud.[9] Dkt. No. 40 ¶¶ 103, 115.

---

[9] Needham cannot split its alleged mail fraud predicates into numerous separate acts in order to save its RICO claim. Courts have recognized that "the raw number of predicate acts has never been determinative, especially when only mail and wire fraud are alleged." *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1278 (7th Cir. 1989); *accord Nortman v. Itex Energy Corp.*, No. 84 c 421, 1989 WL 81921 (N.D. Ill. July 12, 1989) ("The fact that several acts of mail and wire fraud have been alleged is, without more, of little significance."); *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F. Supp. 579, 584-85 (S.D.N.Y. 1989) (fifty acts of mail fraud in furtherance of a single scheme

This simple fraudulent scheme is exactly the type of scheme that courts in this Circuit have found insufficient to establish the closed-ended continuity necessary to state a RICO claim.[10]  *Gross*, 628 F. Supp. 2d at 475 (noting that a single, relatively simple fraudulent scheme with the single purpose to deceive and steal from two identified victims is insufficient to establish a pattern of racketeering activity under the RICO statute); *Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 616 (S.D.N.Y. 2004) (finding a scheme with three participants, one purpose, and one victim too narrow to show a pattern of racketeering activity); *Lefkowitz v. Bank of N.Y.*, No. 01-cv-6252 VM, 2003 WL 22480049, at *9 (S.D.N.Y. Oct. 31, 2003) (finding the plaintiff's RICO claim insufficient where the allegations amounted to nothing more than that "a small number of parties engaged in activities with a narrow purpose directed at a single or at most three victims"); *Weizmann Inst. Of Sci.,* 229 F. Supp. 2d at 256-57 (finding the plaintiff's allegations insufficient to show continuity when they consisted of several predicate acts committed by one participant against a small number of victims in furtherance of a single fraudulent scheme).

## 2.    Open-Ended Continuity

Needham also fails to plead any facts that would support a claim of open-ended continuity. In fact, a scheme directed at a single victim, such as the one alleged in the Amended Complaint, precludes a finding of open-ended continuity as a matter of law.  *Leung v. Law,* 387 F. Supp. 2d

---

insufficient to constitute a RICO pattern); *Gross*, 628 F. Supp. 2d at 494 (noting that "insofar as Plaintiffs' RICO claims are grounded on mail and wire fraud, a multiplicity of such predicate acts without more does not necessarily constitute a pattern of racketeering activity.")

[10] Even if the alleged enterprises existed as Needham alleges for eight years (Dkt. No. 40 ¶¶ 104,116), that fact alone would not be dispositive of the "continuity" requirement.  *First Capital Asset Mgmt. v. Satinwood, Inc.,* 385 F.3d 159, 181 (2d Cir. 2004) ("Thus, [while in the Second Circuit] two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." (emphasis in original)); *Feirstein v. Nanbar Realty Corp.*, 963 F. Supp. 254, 259 (S.D.N.Y. 1997) (noting that in determining continuity, the court should not "'limit its consideration to the duration of the scheme, but should also look at the overall context in which the acts took place'…." (internal citations omitted)).

105, 125 (E.D.N.Y. 2005) ("[A] fraudulent scheme which targets a single business or person is deemed to be 'inherently terminable,' and thus incapable of presenting an open-ended threat of continuing criminal activity.").  Second, "fraud (the object of which is by definition to obtain money or property from others) has been held not to be 'inherently unlawful' in the RICO continuity context." *International Brotherhood of Teamsters v. Carey,* 297 F. Supp. 2d 706, 715 (S.D.N.Y. 2004).  Third, the Amended Complaint concedes at paragraph 73 that the Access entities were a legitimate business that performed legitimate staffing services for, among others, Needham. *Cofacredit*, 187 F.3d at 229 (reversing the district court's finding of open-ended continuity where there was insufficient proof that the incidents of fraud were a regular means by which the defendants conducted business).  Finally, there is no "ongoing threat" of criminal activity where the alleged association-in-fact enterprise ceased to exist because (a) two of its three member entities were formally dissolved in mid-2006 (Dkt. No. 40 ¶¶ 24, 25), (b) Albanese, a key conspirator, resigned from Needham on February 25, 2011 (Dkt. No. 40 ¶ 64), (c) Needham stopped doing business with the Access Entities around the same time (Dkt. No. 40 ¶ 66), and (d) Turano resigned from Needham in 2013 (Dkt. No. 40  ¶ 91).

### 3.    Impermissible Group Pleading

Finally, the mail fraud allegations underlying the alleged "pattern" are defective, as to the Access Defendants, or at least Weinstein and Weber, because the Amended Complaint engages in prohibited group pleading.  By lumping Weber and Weinstein together and failing to distinguish their individual roles or conduct, the mail fraud allegations fail to satisfy either Rule 9(b)'s particularity requirements or Rule 8(a)'s requirement that each defendant be provided with fair notice of the claims against them.  *See Gross*, 628 F. Supp. 2d at 495 ("Such 'group pleading' does not comply with the requirements of RICO or the particularity standards of Rule 9(b).") (citation omitted).

17

**B.      The First and Second Claims for Relief Fail to Adequately Plead a RICO Enterprise**

Needham fails to adequately plead the existence of an enterprise in either of its alternative RICO claims (First and Second Claims for Relief).  Nowhere in the Amended Complaint does Needham allege that the members of the alleged enterprise consisted of anything more than a mutually beneficial business relationship.  The "facts" alleged in Needham's Amended Complaint as to any illegal purpose are entirely conclusory, and allegations purportedly demonstrating the relationships among those associated with the enterprise are equally lacking.  Surely, a plaintiff cannot adequately plead the existence of a RICO enterprise through tautological claims that the Defendants' relationships were "evident from their personal friendships and activities, as well as their roles in carrying out each fraudulent scheme."  Dkt. No. 40 ¶ 99; *see Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) ("[T]here has to be something that ties together the various defendants allegedly comprising the association in fact into a single entity that was formed for the purpose of working together—acting in concert—by means of mail and wire fraud.").

In addition, the Amended Complaint fails to allege facts demonstrating that any of the Access Defendants "participated in the operation or management of the enterprise itself."  *Reves v. Ernst & Young*, 507 U.S. 170, 179-183 (1993) ("In order to participate, directly or indirectly, in the conduct of such enterprise's affairs, one must have some part in directing those affairs.") (internal quotations and citations omitted).  There are no facts that Weber, Weinstein, or the Access Entities provided any more than an incidental role in the purported affairs of the alleged enterprise, let alone directed such affairs.  *See Elsevier*, 692 F. Supp. at 308 (rejecting the plaintiff's RICO claims where the complaint alleged "only that [the defendants] provided services that were helpful to the association in fact enterprise—by ordering subscriptions under false pretenses").

18

In Needham's second RICO claim, only the Access Entities are alleged to comprise the association-in-fact enterprise. Weber and Weinstein are alleged to be the RICO persons conducting the enterprise, and Access Staffing is effectively named as a relief defendant under a theory of vicarious liability. Dkt. No. 40 ¶¶ 108-114. If anything, by pleading this alternative theory of RICO liability, Needham has compounded its RICO pleading problems.[11]

As corporate affiliates in precisely the same line of business and acting within a single unified corporate structure under the control of Weber and Weinstein, the Access Entities were for RICO purposes a single corporate entity that could not associate with itself to form an association-in-fact enterprise. 18 U.S.C. §1961(4) ("any *union or group of individuals* associated in fact although not a legal entity") (emphasis added); *In re Libor-Based Financial Instruments Antitrust Litigation*, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *39 (S.D.N.Y. Aug. 4, 2015) (Buchwald, J.) (noting that "a federal RICO enterprise must be distinct from a set of corporate affiliates and their employees"); *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 113 F. Supp. 2d 345, 366 (E.D.N.Y. 2000) ("Subsidiaries and other affiliates of a parent corporation – alone or together with the parent corporation – do not constitute a RICO enterprise distinct from the parent corporation").

Indeed, if Needham could successfully plead a RICO enterprise consisting only of Access Staffing in association with corporate affiliates–together with a claim that Access Staffing is vicariously liable for the acts of Weber and Weinstein, the RICO persons–then RICO's distinctiveness requirement would be meaningless and easily circumvented. *See Riverwoods*

---

[11] By pleading alternative RICO claims based on mutually irreconcilable facts, Needham has embraced an internal inconsistency that deprives it of the benefit of the rule that otherwise establishes as true their factual allegations. *Ixotic AG v. Kammer*, No. 09-cv-4345 (NG)(JO), 2015 WL 270028, at *14 (S.D.N.Y. Jan. 21, 2015).

*Chappaqua Corp. v. Marine Midland Bank,* 30 F.3d 399, 344 (2d Cir. 1994); *see also C.A. Westel de Venezuela v. Am. Tel. & Tel. Co.*, No. 90 Civ. 6665(PKL), 1994 WL 558026, at *7 (S.D.N.Y. Oct. 11, 1994) ("A close examination of plaintiff's enterprise allegations reveals that the purported enterprise is no more than an association of entities acting on behalf of defendant AT & T.").  For example, the Second Circuit in *Discon, Inc. v. NYNEX Corp.* held that RICO's distinctness requirement was not met where the RICO person was a corporation and the RICO enterprise consisted of the same corporation in association with subsidiaries "acting within the scope of a single corporate structure, guided by a single corporate consciousness."  *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *rev'd on other grounds*, 525 U.S. 128 (1998).  And *Discon* rejected separate incorporation as providing a meaningful distinction, reasoning that "[i]t would be inconsistent for a RICO person, acting within the scope of its authority, to be subject to liability simply because it is separately incorporated."  *Id.*; *Cruz v. FXDirectdealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (holding that corporations that are legally separate but operate within a unified corporate structure and guided by a single corporate consciousness cannot be both the enterprise and the defendant person).

The Amended Complaint makes clear that until the dissolution of Access Temporaries and Access Personnel in mid-2006, the Access Entities lacked distinct corporate identities.  According to Needham, all the Access Entities are or were (1) jointly owned by Weber and Weinstein, (2) operated by Weber and Weinstein "out of the same offices" in Manhattan, and (3) used "interchangeably" by Weber and Weinstein to offer staffing services to the public until the dissolution of Temporaries and Personnel in 2006, at which point Weber and Weinstein "consolidated their business activities" into Access Staffing.  Dkt. No. 40 ¶¶ 24-27, 110.

Thus, the "interchangeable" Access Entities were not separate businesses actively operating in separate areas under different management or personnel. Although each of the Access Entities were separately incorporated and existed concurrently until the dissolution in 2006 of Access Temporaries and Access Personnel, the Access Entities were merely stacks of stationary through which Weber and Weinstein conducted their staffing business. To permit them to form a RICO enterprise would stretch the RICO statute beyond its language, purposes, and reason. Accordingly, Needham's second RICO claim should be dismissed.

Even assuming the Access Entities were sufficiently distinct from one another to associate together as a RICO enterprise, the alleged RICO enterprise terminated no later than August 2, 2006, when the last of Access Staffing's corporate affiliates was dissolved. Dkt. No. 40 ¶¶ 24-27, 109.[12] As of that date, all that was left of the alleged association-in-fact enterprise was Access Staffing. As a result, there can be no RICO liability under Needham's second RICO claim for any acts of racketeering alleged to have been committed after August 2, 2006, requiring the dismissal or striking of all predicate acts alleged to have occurred after that date, which is a substantial majority of the alleged predicate acts. *Id*. at ¶¶ 36, 40, 48.

## C.   Access Staffing Cannot Be Held Vicariously Liable

Needham's second RICO claim seeks to hold Access Staffing vicariously liable. Dkt. No. 40 ¶¶ 118-121. When a corporate defendant is not distinct from the RICO enterprise, as is the case here, courts do not permit vicarious liability against the corporate defendant on the theory that such an end run would eviscerate RICO's distinctiveness requirement. *C.A. Westel de Venezuela v. Am. Tel. & Tel. Co*., No. 90 Civ. 6665(PKL), 1994 WL 558026, at *4 (S.D.N.Y. Oct. 11, 1994) (noting

---

[12] The precise dissolution dates of Access Personnel and Access Temporaries can be found on the New York Secretary of State's website. http://www.dos.ny.gov/corps/bus_entity_search.html.

that the distinctness requirement "would be rendered meaningless if plaintiffs were permitted to name an employee as the RICO person and the corporation as the RICO enterprise, and then to hold the corporation responsible for the employee on a theory of *respondeat superior*").  But even when a corporate defendant is not distinct from the RICO enterprise, the doctrine of vicarious liability under RICO has a very limited application in this Circuit.  *See Mikhlin v. HSBC*, No. 08-CV-1302 (CPS), 2009 WL 485667, at *8 (E.D.N.Y. Feb. 26, 2009) (noting that courts in the Second Circuit generally do not impose vicarious liability under RICO unless the corporate defendant is a "central figure" in the RICO scheme) (citation omitted).

Here, the three Access corporate affiliates comprising the alleged RICO enterprise are each part of a unified corporate structure guided by a single corporate consciousness.  Thus, Access Staffing is not sufficiently distinct from the association-in-fact enterprise to permit any RICO liability against Access Staffing, vicarious or direct, without running afoul of RICO's distinctiveness requirement.  Moreover, even if Access Staffing is distinct enough from the RICO enterprise to satisfy RICO's distinctiveness requirement, Needham's second RICO claim does not explain how Access Staffing was a "central figure" in the RICO scheme beyond the allegation, made on information and belief and without alleging any facts from which to determine the strength or validity of the belief, that its principals (Weber and Weinstein) divided the proceeds of the scheme among themselves and the other defendants, which is baseless speculation.  Indeed, it is Weber and Weinstein who are alleged in the Amended Complaint to be the central figures "controlling" Access Staffing, not the other way around.  Dkt. No. 40 ¶118.

Moreover, at a minimum, there can be no vicarious RICO liability for Access Staffing for acts committed after August 2, 2006, when the alleged association-in-fact enterprise indisputably terminated with the dissolution of two of its three corporate members.  Nor can there be any

vicarious RICO liability for Access Staffing for acts committed before December 16, 2004, the date of Access Staffing's incorporation.  Dkt. No. 40 ¶¶ 26, 109.  Thus, even if Access Staffing could be held vicariously liable for the acts of its principals, which we doubt, the liability would be limited to conduct committed during the alleged association-in-fact enterprise's twenty months of existence, a fraction of the $2.3 million that Needham claims to have lost as a result of the Defendants' fraudulent invoicing scheme.

## POINT III.   THE FRAUD CLAIM (FOURTH CLAIM FOR RELIEF) IS FATALLY DEFECTIVE AS TO THE ACCESS DEFENDANTS

In its allegations of fraud against the Access Defendants, the Amended Complaint is legally insufficient in at least three distinct areas.

### A.   Detrimental Reliance

Nowhere in the Amended Complaint is it alleged that Needham actually acted on the Access Defendants' purportedly false representations, which, it avers, were limited to the invoices. To the contrary, Needham affirmatively pleads that it relied only on the signatures of Turano and Albanese, which provided the authorization to make the payments at issue.  *See* Dkt. No. 40 ¶¶ 18(f), 42(c), 50(j), 130.  It is hornbook law that such an absence of causation/reliance will defeat any claim of fraud.  *See, e.g.,* 60A N.Y. Jur. 2d Fraud and Deceit § 149.

### B.   Justifiable Reliance

Moreover, where, as here, the purported misrepresentations of the Access Defendants were not peculiarly within their knowledge, no claim for fraud may be maintained.  *See LBBW Luxemburg S.A. v. Wells Fargo Securities LLC*, 10 F. Supp. 3d 504, 517-18 (S.D.N.Y. 2014).  As discussed in greater detail *supra*, at all times Needham had in its hands the means to test the veracity of the purportedly false invoices, but declined to do so.  Needham accordingly cannot "complain that [it] was induced … by misrepresentations" to do anything in as much as the "facts

represented [were] not matters peculiarly within the [Access Defendants'] knowledge, and [Needham had] the means available to [it] of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation…." *Danann Realty Corp. v. Harris*, 5 N.Y. 2d 317, 322 (1959).

### C.   Breach of Contract

It is clear from the Amended Complaint that Needham and the Access Entities had a very longstanding business relationship, and, that, of necessity, an oral contract or contracts existed between them.  Intrinsic to Needham's fraud claim is the indirectly pleaded contention that this contractual arrangement allowed for payment to the Access Defendants only upon compliance with what Needham would have this Court believe were its terms, for example, payment for permanent placements were made solely on a contingent basis.  The Access Defendants obviously disagree with Needham's version of the contract terms.  Thus, a breach of contract claim is indispensable to Needham's fraud claim.  The purported misrepresentations cannot have been collateral or extraneous to the contractual arrangement, but, rather, were inextricably related to it. For this reason, the fraud claim cannot be maintained.  *See Krantz v. Chateau Stores of Canada*, 256 A.D.2d 186, 187 (N.Y. App. Div. 1998) ("To plead a viable cause of action for fraud arising out of a contractual relationship, the plaintiff must allege a breach of duty which is collateral or extraneous to the contract between the parties.") (citations and quotations omitted).

## CONCLUSION

Based on the foregoing, and upon the moving papers of Defendant Joseph Turano, which are incorporated herein, the Access Defendants respectfully request that the Court dismiss Needham's Amended Complaint (Dkt. No. 40) with prejudice.[13]

---

[13]  If the Court dismisses the civil RICO claims in this case, it should also decline to exercise supplemental jurisdiction over any state law claims that may remain, since the Court will have "dismissed all claims over which it

Dated: New York, New York
October 23, 2015

Respectfully submitted,

MOSES & SINGER LLP

By: _____/s/_____
    Henry Bergman
    Email: hbergman@mosessinger.com
    Jason Canales
    Email: jcanales@mosessinger.com
    Matthew Handler
    Email: mhandler@mosessinger.com
    405 Lexington Avenue
    New York, NY  10174
    Telephone: (212) 554-7800

-and-

NEWMAN & GREENBERG LLP

By: _____/s/_____
    Richard A. Greenberg
    Email: rgreenberg@newmangreenberg.com
    Steven Y. Yurowitz
    Email: syurowitz@newmandgreenberg.com
    William J. Dobie
    Email: bdobie@newmangreenberg.com
    950 Third Avenue
    New York, NY 10022
    Telephone: (212) 308-7900

    Attorneys for Defendants
    ACCESS STAFFING, LLC, STEVE WEBER,
    and MICHAEL WEINSTEIN

---

has original jurisdiction….” *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 446-48 (2d Cir. 1998) (citing 28 U.S.C. § 1367(c)(3)); *Castellano v. Board of Trustees,* 937 F.2d 752, 758 (2d Cir. 1991) (“[I]f the federal claims are dismissed before trial, … the state claims should be dismissed as well.”); *see also, e.g., First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.,* 219 F. Supp. 2d 576, 588 (S.D.N.Y. 2002), *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159 (2d Cir. 2004) (“As the RICO claims have been dismissed, the Court is not obliged to exercise supplemental jurisdiction [over the remaining state law claims], and it declines to do so.”); *Turner v. New York Rosbruch/Harnik, Inc.,* 84 F. Supp. 3d 161, 171 (E.D.N.Y. 2015) (“In accordance with the guiding principle that district courts will not typically maintain state claims once the anchoring federal claims are dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.”).