UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

NEEDHAM & COMPANY, LLC,

                    Plaintiff,

          - against -

ACCESS STAFFING, LLC, STEVE WEBER,
MICHAEL WEINSTEIN, JOSEPH TURANO,
and GLEN ALBANESE,

                    Defendants.
----------------------------------X

**MEMORANDUM AND ORDER**

15 Civ. 2487 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


     In this action, plaintiff Needham & Company, LLC ("Needham"
or "plaintiff") alleges that defendants, including two former
high-level Needham employees, orchestrated an eight-year-long
fraud in which they created and caused Needham to pay falsified
invoices for staffing services that were never rendered to or
requested by Needham.  Plaintiff asserts claims of racketeering,
RICO conspiracy, fraud, breach of fiduciary duty, and unjust
enrichment.  Defendants move to dismiss, contending that that
plaintiff's claims are time-barred and otherwise fail to state a
claim upon which relief can be granted.  For the reasons that
follow, defendants' motion to dismiss the RICO claims as time-
barred is converted to a motion for summary judgment and denied,
and their motions to dismiss are denied in remaining part.

## I. BACKGROUND

### A. Factual Background

Plaintiff's Amended Complaint, ECF No. 40 ("Complaint" or "Compl."), alleges the following facts, which we presume to be true in evaluating the instant motions.

#### 1. The Parties

Needham is a national investment banking and asset management firm that, during the time period relevant to this action, employed approximately 150-200 full-time employees across five offices. Compl. ¶¶ 12-13.  It occasionally used third-party staffing companies to source permanent and temporary employees. Id. ¶¶ 13-16.  However, Needham preferred to find both permanent and temporary employees from other sources -- such as online job postings and recommendations from current employees -- in order to save costs.  Id. ¶ 13.  Needham also routinely used third-party vendors for other services, such as printing, travel, office furniture, and tickets for sporting events.  Id. ¶ 17.  Needham's internal policies required that any payment to an outside vendor be approved by two individuals: (1) the head of the department requesting the vendor's services; and (2) Needham's Chief Financial Officer ("CFO").  Id. ¶ 18.

Defendants Glen Albanese and Joseph Turano are former employees of Needham.  Compl. ¶¶ 8-9.  Albanese, first hired in 1996 as an accountant, was promoted to the position of CFO in 2000.

Id. ¶ 19.   Turano was hired in 2000 as Vice President of Human Resources, in which position Turano was responsible for overseeing Needham's human resources functions, including staffing.   Id. ¶ 21.  As noted, under Needham's outside vendor policy, all expenses relating to staffing vendors had to be approved by Turano (as department head) and Albanese (as CFO).   Id. ¶ 22.

Defendants Steve Weber and Michael Weinstein are the co-owners and co-founders of defendant Access Staffing, LLC ("Access Staffing"), a staffing services company formed in 2004.  Compl. ¶¶ 6-7, 26.  Previously, Weber and Weinstein owned and operated Access Personnel Corp. ("Access Personnel") and Access Temporaries, Inc. ("Access Temporaries"), two staffing companies that they formed in 1986 and 1991, respectively.  Id. ¶ 24-25.  Both Access Personnel and Access Temporaries were dissolved in or around 2006, id.; however, plaintiff alleges that all of Access Personnel, Access Temporaries, and Access Staffing (collectively, the "Access entities") were operated out of the same offices and that Weber and Weinstein "used the entities interchangeably to offer staffing services to the public and to commit the frauds alleged."  Id. ¶ 27.  Plaintiff also alleges close personal relationships between Turano, Albanese, Weber, and Weinstein.  Id. ¶¶ 23, 30-31.

## 2. The Fraud

Plaintiff alleges that in 2002, Albanese and Turano agreed with Weber and Weinstein that Weber and Weinstein, through the

Access entities, would submit false invoices for staffing services to Needham, and that Albanese and Turano would cause Needham to pay for the invoices.  Compl. ¶ 32.  The fraud would ultimately extend to three types of false invoices.

### a. Retained Searches

In a "retained search," a staffing firm is hired and paid an agreed fee to perform a search for candidates to fill a defined vacancy.  Compl. ¶ 35.  A portion of the fee is paid upfront, with the balance paid once the vacancy is filled.  Id.  Plaintiff alleges that, starting in 2002, defendants caused the Access entities to issue, and Needham to pay, false invoices for purported retained searches that had never been authorized by Needham or conducted by the Access entities.  Id. ¶ 36.  In a chart, plaintiff lists 13 allegedly false invoices, identifying: the invoice number, the invoice date and method of delivery (fax or U.S. mail), the amount, the description on the invoice (such as "[a]dvance payment on retained search for General Counsel Position"), the particular Access entity that issued the invoice, and the date of payment by Needham.  Id.  The payments total $357,100 and were made between December 2002 and April 2010.  Id.

### b. Contingent Searches

In a "contingent search," the staffing firm works with an individual candidate, submitting his or her resume to potential employers, and is paid a fee representing a portion of the

4

candidate's yearly salary if and when the candidate is hired.
Compl. ¶ 35. Plaintiff alleges that around November of 2003,
defendants expanded their fraud to include causing Access entities
to issue, and Needham to pay, false invoices for contingent
searches that were never authorized by Needham or conducted by the
Access entities. Id. ¶ 39. Instead, defendants caused Needham to
pay fees to the Access entities for the hiring of full-time
employees who had in fact been hired through unrelated sources,
such as online job postings. Id. In a chart, plaintiff lists 38
allegedly false invoices, identifying: the invoice number, the
invoice date and method of delivery, the amount paid, the employee
name and hiring date listed on the invoice, the particular Access
entity that issued the invoice, and the date of payment by Needham.
Id. ¶ 40. The payments total $986,550 and were made between
December 2003 and July 2010. Id.

### c. Temporary Conference Staff

Plaintiff alleges that around October of 2004, defendants
further expanded their fraud to include causing the Access entities
to submit, and Needham to pay, false invoices for staffing services
related to the hiring of temporary employees for Needham's annual
investor conferences. Compl. ¶ 43. In a chart, plaintiff
identifies 29 invoices that it claims were falsely inflated and
"bore little relationship to the number of temporary employees
that had been requested or had worked at the conference." Id. ¶¶

48-49. Plaintiff lists the conference title, the invoice number, the invoice date and method of delivery, the particular Access entity that issued the invoice, and the date of payment. Id. ¶ 48. Needham says it was "defrauded out of a substantial portion" of these payments, which total $1,047,103 and were made between October 2004 and September 2010. Id.

### 3. The Investigations

"In late November 2010, a Needham executive assistant noticed and communicated to various other Needham personnel, including Needham senior management, potential over-charges by a third-party printing vendor" going by the name S&R Graphics Company, Inc. ("S&R"). Compl. ¶ 51. Needham personnel examined S&R's invoices and noticed that they had been approved and signed only by Albanese, in violation of Needham's requirement for two authorized signatures prior to payment. Id. On January 6, 2011, Needham retained the law firm of Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. ("Mintz Levin") to investigate "potential invoicing impropriety related to S&R." Id. ¶ 52. Plaintiff alleges that defendants agreed to suspend their fraudulent staffing invoice activities after Albanese and Turano learned of Mintz Levin's engagement. Id. ¶ 53.

### a. The Mintz Levin Investigation

Mintz Levin conducted its investigation between January 19 and March 24, 2011. Compl. ¶ 57. It "interviewed approximately

6

25 Needham employees" and "compiled and reviewed voluminous records concerning Needham's relationship with S&R and other issues." Id. Plaintiff stresses that "Mintz Levin's investigation focused primarily on S&R's invoices and related misconduct identified during the course of the investigation." Id. However, Access Staffing arose during the investigation at a number of points. Specifically:

58. On January 19, 2011, Mintz Levin interviewed the executive assistant who had identified the S&R issue. At the conclusion of the interview, the executive assistant was asked to identify any other concerns that she had. In response, she raised issues including: (i) office procedures regarding tracking of by-hand deliveries; (ii) Albanese's potential use of four tickets purchased from vendor Wall Street Entertainment to attend a World Series game with the owner of S&R and other vendors; (iii) potential over-charges by Access Staffing; and (iv) Albanese's activities with respect to certain of Needham's financial accounts. She stated that she did not know of any evidence of misconduct in connection with these issues.

59. With respect to Access Staffing, the executive assistant expressed concern that Needham was paying too much for Access Staffing's services and that the invoices lacked sufficient detail. She acknowledged, however, that she and several other Needham employees had been placed at Needham by Access Staffing.

60. On February 3, 2011, Mintz Levin conducted a wide-ranging interview of Albanese. The topics covered included all aspects of the S&R relationship as well as the miscellaneous issues that had been raised in the January 19, 2011 interview, including Albanese's relationships with Access Staffing and other vendors. Albanese asserted that he was not aware of any improprieties. With respect to Access Staffing, Albanese stated little more than that the firm provided "temp service" and was sometimes used "as a headhunter" by Needham.

Compl. ¶¶ 58-60.

Around February 18, 2011, Albanese disclosed that he had submitted a false expense report in connection with his use of the World Series tickets noted above.  Id. ¶ 61.

On February 23, 2011, Mintz Levin conducted a conference call with Ernst & Young (E&Y), Needham's outside auditors, to discuss the status of the investigation, "including Mintz Levin's findings related to Albanese's relationship with S&R and its principals, concerns raised about other vendors, and the fact that Albanese had admitted to submitting a false expense report related to World Series tickets." Compl. ¶ 62.  In response, E&Y refused to certify Needham's annual audit report "until it was permitted to conduct an internal review of Needham's files and conduct interviews with its employees to determine whether any additional fraud had occurred."  Id.  On February 25, Needham and E&Y requested from FINRA a 30-day extension to file Needham's 2010 audited financial statements -- which were due March 1 -- in order for E&Y to complete additional audit work.  Id. ¶¶ 62-63.  FINRA granted the request, and E&Y conducted its investigation over the next three weeks, as detailed below.  Id. ¶ 63.

In the meantime, on February 25, "Needham permitted Albanese to resign[.]" Compl. ¶ 64.  Needham immediately promoted defendant Turano to the position of "Director of Human Resources and

Purchasing," a role in which Turano not only "assumed full control and authority over Needham's purchasing functions," but also "was tasked with revising and implementing new purchasing procedures for Needham to ensure that vendor improprieties did not occur in the future." Id. ¶ 65. Needham says it promoted Turano because of his "long-time service and perceived loyalty to Needham and Needham's trust and confidence in him." Id. "In an abundance of caution in light of the emerging facts regarding Albanese's conduct and E&Y's pending review, Needham's senior management instructed Turano to sever ties with various vendors, including those with which Albanese had had personal contact . . . ." Id. ¶ 66.[1]

Mintz Levin's investigation continued through March of 2011. Access Staffing arose at this time in the following ways:

> 67. On March 2, 2011, Mintz Levin interviewed Needham's controller and an associate in Needham's accounts payable department, focusing primarily on Needham's invoicing and travel-and-entertainment expense processes and its relationships with vendors S&R, an S&R-related company named Jake Graphics and Productions, Inc., and Wall Street Entertainment. Mintz Levin also asked each witness about Access Staffing. The accounts payable associate verified that Access Staffing provided temporary and permanent staffing services to Needham. Both individuals confirmed that, unlike invoices for S&R and Wall Street Entertainment,

---

[1] We consider Access Staffing to be among the "various vendors . . . with which Albanese had had personal contact," not only because the Amended Complaint alleges personal contact between Albanese and Access Staffing and its principals, but also because plaintiff's initial complaint states it explicitly: "Needham's Chairman . . . instructed Turano to . . . sever ties with all vendors that Albanese was involved with, including Access Staffing." ECF No. 1 ¶ 42. See Austin v. Ford Models, Inc., 149 F.3d 148, 155 (2d Cir. 1998) ("The amendment of a pleading does not make it any the less an admission of the party." (internal quotation marks omitted)), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506, 509–10 (2002).

which had been approved solely by Albanese, Access
Staffing's invoices had been approved by both Albanese
and Turano per firm policy.

68. Between March 5, 2011, and March 9, 2011, on
four occasions, Needham's Chairman spoke to Turano about
various issues that had arisen during Mintz Levin's
investigation, including Access Staffing.  During each
of these conversations, Turano maintained that Access
Staffing had provided legitimate and quality services to
Needham and that there were no issues concerning any of
Needham's payments to Access Staffing.  Turano
identified several respected Needham employees who had
been sourced through Access Staffing.

69. On March 9, 2011, Mintz Levin conducted a
telephonic interview of Turano regarding various topics.
With respect to Access Staffing, Turano told Mintz Levin
that the company's invoices had never raised any
concern.  He explained that he had personally selected
Access Staffing to identify and screen job applicants
because they did a "great job," brought in "good people,"
and "did a good job filling [positions] quick[ly]" with
"good performers" and "high[] quality personnel."
Turano further stated that Access Staffing had provided
additional value in supporting Needham's annual investor
conferences by screening temporary employees in advance
of the conferences and ensuring that the employees had
qualifications necessary to interact with Needham's
sophisticated investors.  Turano further represented
that Needham routinely hired over 40 temporary staff
through Access Staffing for each of its investor
conferences.  Turano acknowledged that Needham "pa[id]
a premium" for certain employees by using Access
Staffing, but he explained that the expense was
necessary due to the type of personnel that were being
sought.  Turano's statements were false.

70. On March 11, 2011, Mintz Levin interviewed an
associate in Needham's human resources department who
had previously worked in human resources functions at
other firms.  The associate confirmed that Turano, not
Albanese, was in charge of recruiting and staffing and
that Access Staffing provided legitimate staffing
services to Needham.  She further stated that, based on
her years of experience in the industry and with Access

Staffing in particular, the amounts charged by Access
Staffing did not seem out of the ordinary.

71. In mid-March 2011, Mintz Levin obtained and
reviewed all of Access Staffing's invoices to Needham
for the years 2009 and 2010 and found no red flags.
Mintz Levin also requested Turano to review certain of
the invoices. In response, Turano told Mintz Levin that
the invoices were "all ok" and that he had "no issues"
with them.

Compl. ¶¶ 67–71 (brackets in Complaint).

Needham points to a number of differences between the Access
Staffing invoices and those of S&R and another vendor called Data
Source Partners, for which Needham already suspected Albanese of
misconduct. Compl. ¶ 72. In particular, "S&R and Data Source
Partners were non-existent companies"; their "invoices had all
been sent directly to Albanese" and "were approved by Albanese
only," in violation of Needham's two-approval policy; these
invoices "contained obvious errors in arithmetic, dates, fiscal
quarter information, and other details"; and "many of the invoices
contained irregular notations requesting unusual payment
arrangements, such as immediate wire transfer or personal delivery
of a check." Id. The Access Staffing invoices, in contrast,
contained no such irregularities, and Mintz Levin confirmed Access
Staffing had a legitimate business presence and served other
customers, and that "several Needham employees for whom Access
Staffing had invoiced Needham had indeed been placed by Access
Staffing." Id. ¶ 72–73. In mid-March, Mintz Levin concluded its

investigation, finding evidence of fraud by Albanese in connection
with the World Series tickets, S&R, and Data Source Partners, but
"no evidence of improper conduct with respect to Access Staffing."
Id. ¶ 74.

### b. The Ernst & Young Investigation

As noted, in February and March of 2011, E&Y conducted its
own investigation for fraud in connection with its audit of
Needham's 2010 financial statements.  Given the "significance" of
the "doubts about the integrity of Needham's CFO with respect to
his conduct involving the World Series tickets and S&R," additional
E&Y partners, including its General Counsel, director of its
Professional Practice group, and a partner in its Fraud
Investigation & Dispute Services group, were brought on to advise
the investigation.  Compl. ¶ 77.

> 78. E&Y was given open access to Needham's files.
> Over the course of the following three weeks, among other
> things, E&Y: (i) met extensively with Mintz Levin to
> discuss its investigation, including Access Staffing
> issues, and was given access to all documents that Mintz
> Levin had reviewed, including the Access Staffing
> invoices; (ii) conducted independent interviews with
> numerous Needham personnel, including Turano (who was
> questioned about Access Staffing, among other things,
> and maintained that all payments to Access Staffing were
> legitimate); and (iii) conducted an independent analysis
> of Needham's records related to third-party vendors,
> including by testing specific line items, searching for
> unusual relationships and patterns with respect to
> specific line items and vendors, and examining other
> areas for potential manipulation.

> 79. On March 18, 2011, E&Y reported to Needham it
> had conducted the above activities and others, and had

completed its investigation. E&Y reported that it had identified no material irregularities beyond what Mintz Levin had identified, that no other vendors appeared to be implicated by Albanese's fraud, and that Albanese's fraud had not impacted the integrity of Needham's financial statements. E&Y noted that, in light of the circumstances, it had conducted its review with an increased risk assessment and lower materiality thresholds than it otherwise would have. E&Y advised Needham that it would issue an unqualified opinion regarding its financial statements. Shortly thereafter, it did so.

Id. ¶¶ 78–79.

### c. The FINRA and Government Investigations

On March 24, 2011, Needham filed a FINRA Form U-5 stating its conclusion that Albanese engaged in misconduct. Compl. ¶ 81. Thereafter, "FINRA initiated an investigation and enforcement action against Albanese related to the World Series tickets, S&R, and Data Source Partners." Id. On June 14, 2011, Needham was notified that the FBI and the United States Attorney's Office for the District of New Jersey "were investigating Albanese, S&R, and Data Source." Id. ¶ 82.

"In or around February 2012, Mintz Levin was notified for the first time that the government was investigating whether Albanese had conspired with additional Needham vendors, including Access Staffing, to defraud Needham. The government did not share the basis for its suspicion but requested additional files from Needham." Compl. ¶ 83.

The FINRA action was resolved in September of 2012, when Albanese agreed to a permanent ban from FINRA.  Compl. ¶ 86.  On November 21, 2013, Albanese pled guilty to an information filed in the United States District Court for the District of New Jersey alleging a conspiracy to commit wire fraud "in connection with the false invoices from S&R and Data Source."  Id.  Albanese agreed to pay $1,000,000 in restitution to Needham, and on November 17, 2014, he was sentenced to 33 months' incarceration and three years' supervised release.  Id.

### d. Needham's Alleged Discovery of the Fraud

In February of 2013, the Government informed Mintz Levin that it was investigating whether Albanese and Turano were working in concert to pay false invoices to Access Staffing.  Compl. ¶ 87.  Mintz Levin conducted certain interviews as requested by the FBI and learned that "most" employees it spoke to for whom Needham had paid placement fees to Access Staffing were not, in fact, placed at Needham by Access Staffing.  Id.  Mintz Levin informed the FBI and sought to take certain further steps, but "[t]he government requested that Needham delay further action until it had completed certain aspects of its investigation."  Id. ¶ 88.

In May of 2013, the Government advised Mintz Levin it could resume its investigation.  Compl. ¶ 89.  Mintz Levin interviewed "various" Needham employees for whom Needham had paid placement fees to Access Staffing, "[e]ach" of whom denied Access Staffing

14

had any involvement in his or her placement at Needham.  Id.  Mintz Levin attempted to interview Turano on June 10, 2013.  Id. ¶ 90. He refused to answer most questions, but acknowledged that he had been contacted by Weber regarding the investigation into Access Staffing.  Id.  Turano stated, "sometimes you just get sucked into stuff and it's a slow type of seduction."  Id.  Turano was placed on administrative leave and later permitted to resign.  Id. ¶ 91. Plaintiff's investigation continued thereafter, culminating in this action.  Id. ¶ 92.

## B. Procedural History and Additional Submissions

### 1. The Complaints

Plaintiff, through Mintz Levin as counsel, filed its initial complaint in this Court on April 1, 2015.  ECF No. 1.  In a telephone conference of July 23, 2015, the Court asked plaintiff and its counsel to consider whether it was prudent to retain substitute counsel, given that Mintz Levin's investigation was a potential issue in the litigation.  Thereafter, plaintiff engaged the law firm of Lankler Siffert & Wohl LLP as successor counsel, and Mintz Levin voluntarily withdrew.  Successor counsel filed plaintiff's Amended Complaint on September 25, 2015.

The Amended Complaint asserts six claims.  Counts One and Two are claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, advanced in the alternative against (1) all defendants and (2) only Weber,

Weinstein, and Access Staffing.  Count Three alleges a RICO Conspiracy against Turano and Albanese.  The remaining counts assert state-law claims: fraud against all defendants (Count Four); breach of fiduciary duty against Turano and Albanese (Count Five); and unjust enrichment against all defendants (Count Six).

**2. The Motions to Dismiss and Initial Briefing**

The defendants have filed and briefed their motions to dismiss in three separate groups.  Access Staffing, Weber, and Weinstein (the "Access defendants") filed their motion and a supporting memorandum, ECF No. 55 ("Access Mem."), on October 26, 2015.  Turano also filed his motion to dismiss and a legal memorandum, ECF No. 59 ("Turano Mem."), on October 26.  Plaintiff responded to both memoranda on November 23, 2015.  See ECF Nos. 70 ("Opp'n to Access"), 72 ("Opp'n to Turano").  Defendants replied on December 23.  See ECF Nos. 78 ("Access Reply"), 77 ("Turano Reply").  The Access defendants and Turano's papers adopt each other's arguments for dismissal.  Access Mem. 1 n.1; Turano Mem. 1.

Separately, defendant Albanese, proceeding pro se, moves to dismiss in an undated submission filed November 13, 2015, in which he adopts his co-defendants' arguments and asserts that he was not properly served with the Amended Complaint.  ECF No. 65 ("Albanese Mem.").  Plaintiff responded by memorandum dated November 23.  ECF No. 68.  Albanese did not reply.

### 3. The New Exhibits and Further Briefing

The Access defendants' reply memorandum includes two exhibits that became the subject of dispute and further briefing.  Exhibit A is a FINRA "BrokerCheck Report" pertaining to defendant Albanese. In a section entitled "Employment Separation After Allegations," the report contains an entry stating in part: "After resignation, review found evidence of payments to [Albanese's] neighbor's company for IT and recruiting services that were never rendered." Access Reply Ex. A, at 14 (upper-case removed).

Exhibit B is a FINRA Department of Enforcement disciplinary complaint dated September 27, 2012.  It describes an episode in early 2011 in which Albanese instructed "RF," the firm's controller, to alter a spreadsheet of annual payments to vendors that had been requested by Needham's management, including reducing payments to "AS, a staffing services company" by almost $1 million.  Access Reply Ex. B ¶¶ 24–25.  Specifically, the complaint states the following:

> 24. Sometime in January or February 2011, RF, the Firm's Controller, prepared at the request of the Firm's Chief Executive Officer ("CEO") a spreadsheet of payments to vendors who provided recruiting and consulting services to the Firm for the period 2006 through 2010.

> 25. Albanese instructed RF to reduce the annual amounts paid by the firm to AS, a staffing services company. Albanese provided new annual amounts to RF, who subsequently changed the spreadsheet as directed by Albanese.  The altered spreadsheet, which was provided to the Firm's CEO, reflected drastically reduced annual amounts paid to AS.  In total, Albanese instructed RF to

reduce the annual amounts paid by the Firm to AS by $950,850.

Id.

On January 7, 2016, we granted plaintiff's request to submit a sur-reply, which plaintiff filed on January 19. See ECF No. 84 ("Pl.'s Sur-Reply"). Plaintiff objected to our consideration of the new exhibits in connection with defendants' motions to dismiss. In the alternative, plaintiff responded to the documents on the merits, in part by submitting the Declaration of Wynter L. Deagle, an associate at Mintz Levin involved in the investigation. ECF No. 83 ("Deagle Decl."). Deagle affirms that the "neighbor's company" that Needham paid for "recruiting services that were never rendered" referred to in Exhibit A was Data Source Partners, not Access Staffing. Deagle Decl. ¶ 14. She also details the provenance and context of the altered spreadsheet discussed in Exhibit B. Specifically, Deagle explains that: (1) in January of 2011, Needham senior management asked Albanese to prepare a spreadsheet reflecting payments to certain vendors between 2006 and 2010, including recruiting firms, id. ¶ 3; (2) the request was made because Needham was concerned it was overpaying for vendors' services, not because it suspected fraud, id.; (3) Albanese provided the spreadsheet to Needham's senior management in February 2011, who in turn provided it to Mintz Levin, id. ¶ 4; and (4) on March 4, 2011, Needham's controller Rob Fiordaliso

informed Deagle and R. Robert Popeo, Mintz Levin's chairman, that payments shown in the requested spreadsheet were incorrect and had been altered, and that Albanese had instructing him to reduce the amounts paid to certain vendors, including Access Staffing, <u>id</u>. ¶ 5. Deagle further states that she obtained and reviewed all of Access Staffing's invoices to Needham for the prior two years and "observed no irregularities," in contrast to the many irregularities found in invoices from S&R and Data Source Partners. <u>Id.</u> ¶ 8. Deagle asserts that she did not suspect the underlying Access Staffing voices were fraudulent, but only that "Albanese had altered the spreadsheet in order to avoid criticism from senior management that he had allowed Needham to pay too much for recruiting services." <u>Id.</u> ¶ 11. Needham does not dispute that the spreadsheet was altered to reduce reported payments to Access Staffing by $950,850. Pl.'s Sur-Reply 5-6.

The Access defendants, in turn, sought and received permission to file their own sur-reply, which they did on January 28. <u>See</u> ECF No. 87. There, they argue (1) that it would be procedurally acceptable to take judicial notice of the regulatory documents presented in their reply; and (2) that, in any event, plaintiff's sur-reply papers, and in particular the Deagle Declaration, admit the truth of their assertions regarding the altered spreadsheet. Finally, in May and June of 2016, the parties submitted letters disputing the application, if any, of the Second

Circuit's decision in Goel v. Bunge, Ltd., 820 F.3d 554 (2d Cir. 2016), to our consideration of the newly-submitted evidence.  ECF Nos. 88, 89.

Oral argument was heard on July 13, 2016.

## II. LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must "'state a claim to relief that is plausible on its face'" by "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In applying this standard, we accept as true all factual allegations in the plaintiff's pleadings and draw all reasonable inferences its favor. Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012). However, "we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

As discussed infra, we convert defendants' motion to dismiss plaintiff's RICO claims as untimely to a motion for summary judgment.  A motion for summary judgment is appropriately granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a). The Court's function is "to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). Thus, in ruling on the motion, "the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute regarding a material fact and summary judgment is improper. <u>Anderson</u>, 477 U.S. at 248.

### III. DISCUSSION

We discern a genuine issue as to the timeliness of plaintiff's RICO claims that cannot be fully resolved on the record before us. Accordingly, we convert defendants' motion to dismiss on this basis to a motion for summary judgment and deny the motion. Otherwise, plaintiff's claims are adequately pled.

**A. Counts One and Two: Substantive RICO Claims**

Counts One and Two are substantive RICO claims pled in the alternative. Count One is advanced against all defendants and identifies "the Access Entities and individual defendants" as the "associated-in-fact" enterprise. Count Two is advanced against

21

Weber, Weinstein, and Access Staffing and identifies "the Access Entities" as the enterprise.

### 1. Timeliness

#### a. Governing Law

Civil RICO claims are governed by a four-year limitations period.  See <u>Rotella v. Wood</u>, 528 U.S. 549, 552 (2000); <u>Agency Holding Corp. v. Malley-Duff & Assocs., Inc.</u>, 483 U.S. 143, 156 (1987).  The Second Circuit applies an injury discovery rule, under which the limitations period begins to run when plaintiff discovers, or reasonably should have discovered, the alleged injury.  See <u>Koch v. Christie's Int'l, PLC</u>, 699 F.3d 141, 148-49 (2d Cir. 2012); <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 154 F.3d 56, 60 (2d Cir. 1998) (per curiam).

To determine if a plaintiff reasonably should have discovered a RICO injury by a certain date, we undertake a two-step inquiry. First, "[i]nquiry notice -- often called 'storm warnings' in the securities context -- gives rise to a duty of inquiry when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." <u>Koch</u>, 699 F.3d at 151 (quoting <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 168 (2d Cir. 2005)) (internal quotation marks omitted)). If "storm warnings" trigger a duty to inquire and the "RICO plaintiff 'makes no inquiry . . . knowledge will be imputed as of the date the duty arose.'"  <u>Id.</u> at 153 (quoting <u>Lentell</u>, 396 F.3d

at 168).  On the other hand, "[w]here a RICO plaintiff does begin or has begun to inquire once the duty arises, the Court must determine when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence, and the statute of limitations begins to run on that date."  Id. (citing Lentell, 396 F.3d at 168).[2]

### b. Conversion to Motion for Summary Judgment

Preliminarily, we must resolve whether to consider the new exhibits submitted with the Access Reply and Needham's Sur-Reply on the timeliness issue.  If, in connection with a motion to dismiss pursuant to Rule 12(b)(6),

> matters outside the pleadings are presented to and not
> excluded by the court, the motion must be treated as one
> for summary judgment under Rule 56.  All parties must be
> given a reasonable opportunity to present all the
> material that is pertinent to the motion.

Fed R. Civ. P. 12(d).  "As indicated by the word 'shall,' the conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is 'strictly enforced' and 'mandatory.'"  Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006) (quoting Amaker v. Weiner, 179 F.3d 48, 50 (2d Cir. 1999)) (brackets omitted).  A court may convert only part of a 12(b)(6) motion into a motion for summary judgment.  Fernandez v. Windmill

---

[2]     The Second Circuit has explained that "[w]hile inquiry notice as described in Lentell was developed in the context of securities fraud cases, it applies equally in RICO cases."  Koch, 699 F.3d at 141.

<u>Distrib. Co.</u>, No. 12 Civ. 1968 (TPG), 2016 WL 452154, at *2 (S.D.N.Y. Feb. 4, 2016).

We find the additional materials to be highly relevant to both prongs of the RICO injury discovery analysis, and therefore to the question of timeliness. We see no practical purpose in closing our eyes to the evidence before us, only to have it re-emerge and re-briefed on a motion for summary judgment. <u>See</u> <u>Goel</u>, 820 F.3d at 560 ("[T]he Federal Rules of Civil Procedure contemplate that when a district court is presented with materials outside the pleadings at the motion-to-dismiss stage, circumstances sometimes favor their consideration."). Accordingly, pursuant to Rule 12(d), we convert defendants' motion on this issue to a motion for summary judgment.

The parties have had a full and fair opportunity to present all material relevant to this issue. The parties have submitted additional briefs as well as affidavit testimony. <u>See</u> <u>Sahu v. Union Carbide Corp.</u>, 548 F.3d 59, 67 (2d Cir. 2008) ("We have held that 'a party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss.'" (quoting <u>In re G. & A. Books, Inc.</u>, 770 F.2d 288, 295 (2d Cir. 1985)) (brackets omitted)). We also explicitly noted our inclination at oral argument, offering the

parties a chance to be heard, and did not receive a persuasive objection. Oral Arg. Tr. ("Tr.") 10-15, July 13, 2016.[3]   In addition, because we ultimately deny summary judgment, the conversion does not substantially prejudice any party's case.

We thus turn to whether, given the full record before us, Needham discovered or should have discovered its alleged RICO injury prior to April 1, 2011.

### c. Inquiry Notice

We conclude that the undisputed evidence shows a clear record of "storm warnings" prior to April 1, 2011, thus indicating a reasonable probability of fraud. Most glaring is the March 4, 2011 disclosure by Fiordaliso that Albanese had instructed him to alter the spreadsheet reflecting Needham's payments to certain vendors, and specifically to reduce reported payments to Access Staffing by over $950,000. By this point: (1) Albanese had been implicated in multiple frauds, including one for "staffing services never rendered," and had resigned from Needham; (2) the individual who had first identified the S&R and World Series tickets frauds had raised concerns about potential over-charges by Access Staffing and that Access Staffing's invoices lacked

---

[3]     Needham argued it would like to seek a "more fulsome explanation . . . from Mintz Levin and the management team at Needham as to why certain actions were not taken." Tr. 11:20-22. We think the current record, including Ms. Deagle's testimony, presents a well-developed picture of Mintz Levin's rationale for the steps it took and its interpretation of the evidence. Moreover, because the relevant inquiry is whether the investigation was objectively reasonable, Mintz Levin's subjective understanding of the evidence is of limited relevance.

sufficient detail; and (3) Turano, who had succeeded Albanese, had been instructed to sever ties with vendors with which Albanese had personal contact, including Access Staffing.   Taken together, these circumstances show something obviously and seriously amiss with respect to Needham's payments to Access Staffing and suggest a probability that Albanese's misconduct extended to Access Staffing payments.   We therefore conclude as a matter of law that plaintiff was on inquiry notice of the Access Staffing fraud prior to April 1, 2011, triggering its duty to investigate.

Notably, Needham, Mintz Levin, and E&Y did, in fact, investigate Access Staffing in response to these indications of impropriety.   Among other things, Needham's chairman repeatedly questioned Turano about Access Staffing between March 5 and March 9, 2011.  Mintz Levin inquired about Access Staffing in its March 2, March 9, and March 11 interviews, and it obtained and reviewed Access Staffing's invoices issued between 2009 and 2011.   E&Y demanded an opportunity to determine if any other fraud had occurred before certifying Needham's annual audit reports.   It "met extensively with Mintz Levin to discuss its investigation, including Access Staffing issues," "was given access to all documents that Mintz Levin had reviewed, including the Access Staffing invoices," and conducted its own interviews and analysis regarding Access Staffing.  The difficulty here is not that Needham and its agents failed to recognize the storm warnings related to

Access Staffing or investigate them, but that it reached the wrong conclusion: that "Albanese had altered the spreadsheet in order to avoid criticism from senior management that he had allowed Needham to pay too much for recruiting services."  Deagle Decl. ¶ 11.

### d. Reasonable Diligence

Whether Needham fully discharged its duty to investigate is a closer question.  Proceeding on the premise that Needham did not actually discover the Access Staffing-related fraud until after April 1, 2011,[4] we must apply an objective test of whether a reasonably diligent investigation would have revealed the injury prior to April 1.

Needham argues the investigation it performed was reasonably diligent.[5]  Opp'n to Access 12–14.  It engaged a respected law firm and accounting firm, which, having taken a wide range of investigatory steps, did not actually discover the fraud prior to April 1.  This sequence, Needham says, is in itself sufficient to show reasonable diligence.  Needham also argues its investigators were reasonably led astray because the Access Staffing fraud,

---

[4]     We reject defendants' contention that the altered spreadsheet episode, taken alone, constitutes actual notice of this particular fraud.  Tr. 16.  To suggest that Needham had "discovered the injury" is an exaggeration.  Rather, it had discovered that Albanese was responsible for falsifying a firm document.  This is a storm warning, albeit a strong one, not discovery of the RICO injury.

[5]     Mintz Levin and E&Y closed their investigations by March 24, 2011, finding "no evidence of improper conduct with respect to Access Staffing."  Compl. ¶¶ 74, 79.  Thus, Needham does not take the position that a reasonable investigation would have uncovered the fraud after April 1, but that the completed investigation was reasonable.  See Tr. 9.

perpetrated by Albanese and Turano together, was different in kind from the already-discovered frauds perpetrated by Albanese alone.

Neither of Needham's assertions are sufficient to resolve the issue in Needham's favor. First, the hiring of a law firm and accounting firm to investigate suspected impropriety cannot, without more, insulate plaintiff from the unreasonable conduct of its agents. Second, the fact that the Access Staffing-related fraud was somewhat different from Albanese's other frauds because the invoices looked "facially valid" and because of Turano's involvement and assurances is perhaps a reason why this fraud was more difficult to discover, but it is hardly proof that it was reasonable not to discover it.

To determine whether a reasonably diligent investigation would have revealed the fraud, both what was known and the ease of discovery of the unknown must be considered. Here, a substantial amount was known. The backdrop of the investigation was Albanese's other known frauds related to S&R, the World Series tickets, and Data Source Partners (the latter involving "staffing services never rendered"). Additionally, Mintz Levin learned that Albanese had instructed a Needham employee to alter the reported amounts paid to Access Staffing by almost $1 million. The documents embodying the fraud were available. In fact, Mintz Levin collected and reviewed two years' worth of Access Staffing invoices, covering a period during which all three fraudulent schemes (related to

retained searches, contingent searches, and temporary conference staff) were perpetrated.  E&Y reviewed the same record as Mintz Levin, bringing on special senior staff and using a "lower materiality threshold."  Yet limited examination beyond the face of the documents was conducted.

Turning to the ease of discovery, the reality does not favor Needham's position.  At least with respect to the almost $1 million paid to Access Staffing for contingent searches never performed, there is no reason Needham could not have done in 2011 what it ultimately did in 2013: simply ask its own employees (identified by name in the Access Staffing invoices) if they had been hired through the services of Access Staffing.  Such a validation method (a blast email inquiry) is simple, inexpensive, riskless, and swift, and would have quickly revealed that Access Staffing had been submitting, and Needham had been paying, false invoices.  In this context, Needham's acceptance of the conclusion that Albanese, in directing a one million dollar spreadsheet reduction, was simply trying to "avoid criticism from senior management that he had allowed Needham" to overpay for legitimate services from Access Staffing is unreasonable.[6]

---

[6]    At oral argument, counsel for the Access defendants suggested that Needham, Mintz Levin, and E&Y may have deliberately limited the scope of their investigation and ignored Access Staffing-related storm warnings in an effort to forestall further investigation by regulatory authorities.  Tr. 17, 23. Counsel stated that this theory was speculative.  Id. 23.  However, there may be support.  Ms. Deagle lists on Mintz Levin's website the following "representative matter": "Represented board of directors of broker-dealer in

We are, of course, cognizant that the fact a fraud could have been discovered in hindsight does not mean it would have been discovered by the exercise of reasonable diligence.   Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 363 (2d Cir. 2013).   However, the serious deficiencies in this investigation cannot be ignored. Ultimately, we conclude the question of whether Mintz Levin and E&Y acted with reasonable diligence between March 4 and April 1, 2011, cannot be resolved as a matter of law.   See In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 204 (S.D.N.Y. 2003) ("[I]t is a question of fact for ultimate resolution at trial (or on summary judgment if the factual record permits only one conclusion) whether plaintiffs in the exercise of reasonable diligence would have discovered the facts underlying the present claim more than one year before those claims were asserted[.]"); see also Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000); Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 242 n.2 (2d Cir. 1984) ("Where the statute of limitations operates as an affirmative defense . . . issues of fact as to the application of that defense must be submitted to the jury.").   Unless decisive new evidence emerges, the question is a genuine issue of fact for trial.

---

internal investigation which resulted in discovery of multi-million dollar fraud by senior executives.  Secured seven figure restitution award from perpetrators while ensuring that client incurred no penalties or sanctions from regulatory authorities."    See  https://www.mintz.com/professionals/detail/name/wynter-lavier-deagle (last visited Aug. 11, 2016).

**2. Other Elements**

Otherwise, Counts One and Two are adequately pled. To establish a violation of 18 U.S.C. § 1962(c), a plaintiff must plead the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (internal quotation marks omitted). The Access defendants challenge plaintiff's allegations of a RICO "pattern" and a RICO "enterprise."

**a. A Pattern**

"RICO defines a 'pattern of racketeering activity' as requiring 'at least two acts of racketeering activity' committed in a 10-year period." DeFalco 244 F.3d at 320 (quoting 18 U.S.C. § 1961(5)). The predicate acts of racketeering must be "related" and "amount to or pose a threat of continued criminal activity." Id. (quoting H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)).

Here, the submission of 70 false invoices over eight years amounts to a pattern of racketeering activity, despite defendants' objections that there is only one victim and that the only predicate acts alleged are mail fraud. See Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 646, 661 (2008) (approving of civil RICO claim based on mail fraud predicates); Marini v. Adamo, 812 F. Supp. 2d 243, 262-63 (E.D.N.Y. 2011) ("Courts have routinely found that continuity exists where the alleged scheme spans such

31

a substantial period of time, even where only a single victim or single scheme was involved."). We also reject the argument that plaintiff engages in impermissible "group pleading" by failing to distinguish between the individual conduct of the Access entities, Weber, and Weinstein, Access Mem. 17, given that plaintiff makes specific allegations that Weber and Weinstein jointly owned and controlled the Access entities and caused fraudulent invoices to be generated and issued. See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 173 (2d Cir. 2015).

### b. An Enterprise

The RICO statute broadly defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4)). The Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," which must be proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). Furthermore, the alleged enterprise must be an "entity separate and apart from the pattern of racketeering activity in which it engages." Id.

When a plaintiff's claim turns on the existence of an "association-in-fact" enterprise, the plaintiff must allege an

enterprise with "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). Further, in what is commonly called the "operation or management" requirement, each RICO defendant must have "some part in directing" the enterprise's affairs. Reves v. Ernst & Young, 507 U.S. 170, 179 (1993); see First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004) (describing this test as a "relatively low hurdle for plaintiffs to clear, especially at the pleading stage" (citations omitted)).

Counts One and Two of the Complaint allege (in the alternative) two different associated-in-fact RICO enterprises. Count One (against all defendants) alleges an associated-in-fact enterprise of the Access entities and individual defendants. Count Two (against only Weber, Weinstein, and Access Staffing) alleges an associated-in-fact enterprise of only the Access entities.[7]

The RICO enterprise alleged in Count One is adequately pled. The Complaint alleges that the purposes of the enterprise were to

---

[7]   Citing Ixotic AG v. Kammer, No. 09 Civ. 4345 (NG)(JO), 2015 WL 270028, at *14 (S.D.N.Y. Jan. 21, 2015), defendants assert that plaintiff's pleading two substantive RICO counts in the alternative "deprives it of the benefit of the rule that otherwise establishes as true their factual allegations." Access Mem. 19 n.11. We do not agree. Because the two claims do not rely on "mutually irreconcilable facts," they do not run afoul of Federal Rule of Civil Procedure 8(d)(3), which permits inconsistent claims. Ixotic, 2015 WL 270028, at *14; see Am. Buying Ins. Servs., Inc. v. Kornreich & Sons, Inc., 944 F. Supp. 240, 246 (S.D.N.Y. 1996) (permitting RICO enterprises pled in the alternative).

(1) enrich its members at Needham's expense through the submission and payment of fraudulent invoices, and (2) conceal the fraud. Compl. ¶ 98.  It alleges personal and professional relationships among members and describes the roles of each defendant in the scheme.  Id. ¶¶ 30-31, 99.  Finally, the alleged 11-year life of the association-in-fact, id. ¶ 100, is more than sufficient to pursue and achieve these purposes.  These allegations meet the "low threshold" for pleading an associated-in-fact enterprise under Boyle. Automated Teller Mach. Advantage LC v. Moore, No. 08 Civ. 3340 (RMB)(FM), 2009 WL 2431513, at *6 (S.D.N.Y. Aug. 6, 2009) (internal quotation marks omitted).

We reject the Access defendants' objection that "[t]here are no facts that Weber, Weinstein, or the Access Entities provided any more than an incidental role in the purported affairs of the alleged enterprise, let alone directed such affairs." Access Mem. 18.  The Complaint plausibly alleges that Weber and Weinstein, supplied with information about Needham's staffing activities, caused the Access entities to fabricate and issue false invoices and deposited and divided the proceeds after they were received from Needham, thus supporting their participation in and direction of the fraud.

Count Two alleges an association-in-fact of the three Access entities as the applicable RICO enterprise.  This enterprise is adequately pled for substantially the same reasons as in Count

One.  Defendants argue the Complaint alleges that the three Access entities were "interchangeable," and therefore lacked distinct corporate identities.  Thus, defendants say, the Access entities were effectively a single entity that could not associate with itself.  Access Mem. 19–21.  Plaintiff responds that the Complaint alleges the Access entities had distinct corporate structures, and that in any event a single corporate entity could be a RICO enterprise.  Opp'n to Access 21–22.  Defendants reply that Count Two alleges an "association-in-fact" enterprise, not a single-entity enterprise.  Access Reply 7.  Given that "any legal entity may qualify as a RICO enterprise," First Capital Asset Mgmt., 385 F.3d at 173, we fail to see the significance of whether the Access entities were three companies or a single one.

Defendants raise a related argument that the Count Two enterprise terminated in 2006, when Access Personnel and Access Temporaries were dissolved and Weber and Weinstein consolidated their activities into Access Staffing.  Access Mem. 21.  This fact, however, does not limit Count Two's RICO claim to pre-2006 conduct.  An associated-in-fact enterprise "may continue to exist even though it undergoes changes in membership."  United States v. Payne, 591 F.3d 46, 60 (2d Cir. 2010) (internal quotation marks omitted).

Next, defendants argue that Count Two incorrectly labels Weber and Weinstein as RICO "persons" and the Access entities as

the "enterprise," violating the RICO statute's "distinctiveness" requirement because Weber and Weinstein control the Access entities. Access Mem. 19-20. We reject this claim. It is true that a RICO defendant must be distinct from the enterprise alleged. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). "Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation." Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994). This rule, however, does not foreclose naming Weber and Weinstein as RICO "persons" and the Access entities as the enterprise, as a "corporate owner/employee, a natural person, is distinct from the corporation itself[.]" Cedric Kushner, 533 U.S. at 163.

Finally, there is a dispute as to whether Access Staffing can be held vicariously liable for the conduct of Weber and Weinstein in this case. Vicarious liability is appropriately imposed on a corporate entity where (1) that corporate defendant is a central figure in the RICO scheme and benefited from the scheme, and (2) the individual RICO actors are high-level corporate officers who controlled the corporation. See Fairfield Fin Mortg. Grp., Inc. v. Luca, 925 F. Supp. 2d 344, 350 (E.D.N.Y. 2013); Ctr. Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y., 808 F. Supp. 213, 236

36

(S.D.N.Y. 1992), aff'd, 99 F.3d 401 (2d Cir. 1995).  These factors are satisfactorily alleged here: namely, that Access Staffing was a central figure in and benefited from the schemes and that Weber and Weinstein owned and controlled Access Staffing.

## B.  Count Three: RICO Conspiracy

The RICO statute also proscribes any person from conspiring to violate the substantive provisions set forth at 18 U.S.C. §§ 1962(a)-(c).  18 U.S.C. § 1962(d).  Turano argues Count Three should be dismissed because the Complaint fails to allege the elements of a substantive RICO violation.  Turano Mem. 22.  Given that we have reached the opposite conclusion, Turano's motion to dismiss Count Three is denied.  Of course, the ultimate viability of the RICO conspiracy claim turns on the timeliness of the substantive RICO claims.

## C.  Count Four: Fraud

### 1. Timeliness

The limitation period for a claim of fraud in New York is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8).

Turano asserts that 67 of the 86 fraudulent invoices identified in the Complaint[8] were paid prior to April 1, 2009, and thus are outside the six-year limitation period unless saved by the two-year discovery rule. Turano Mem. 6. As discussed <u>supra</u>, plaintiff responds by claiming that it acted with reasonable diligence and did not discover the fraud until May of 2013. Regardless of the resolution of the reasonable diligence issue, 19 of the alleged fraudulent invoices are undisputedly timely.

### 2. Other Elements

Turano argues the common law fraud claim is not well pled. "The elements of fraud in New York include: a false representation of material fact, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." <u>Evans v. Ottimo</u>, 469 F.3d 278, 283 (2d Cir. 2006). Rule 9(b) further requires that "a party must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b).

### a. Particularity

Turano asserts the fraud claim is not pled with sufficient particularity. Turano Mem. 11–13. He argues that while the Complaint lists many alleged fraudulent invoices, it never directly quotes the invoices or specifically states which

---

[8]    We read the Complaint to identify only 70 allegedly fraudulent invoices, 51 of which were paid prior to April 1, 2009. <u>See</u> Compl. ¶¶ 36, 40, 48.

statements in each invoice were fraudulent.  This objection is meritless.  The Complaint identifies 70 allegedly fraudulent invoices and, using a chart, lists the invoice number, invoice date, invoice amount, payment date, and other identifying information for each invoice.  This level of specificity is more than sufficient at this stage of the litigation.  See First Interreg'l Advisors Corp. v. Wolff, 956 F. Supp. 480, 485 (S.D.N.Y. 1997) ("The complaint in a RICO action need not be specific as to each allegation of mail or wire fraud when the nature of the RICO scheme is sufficiently pleaded so as to give notice to the defendants.  This is especially true when the sufficiency of the complaint is being considered before discovery has taken place and when the 'information is exclusively in the possession of those participating in the fraud.'" (citations omitted)).  Moreover, plaintiff's use of a chart to organize and summarize the invoices has a sound basis in law.  See Moore v. PaineWebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999); Fuji Photo Film U.S.A., Inc. v. McNulty, 640 F. Supp. 2d 300, 318 (S.D.N.Y. 2009).

We reject Turano's related argument that the Complaint engages in impermissible "group pleading" because it does not identify precisely who at Access Staffing drafted the invoices.  The Complaint clearly links Weinstein and Weber to the conduct of Access Staffing, and the demanded details of each individual's conduct are not required here.  See Loreley, 797 F.3d at 173 ("Even

under the heightened pleading standard of Rule 9(b), Plaintiffs are not obliged to disaggregate these affiliates to pursue their fraud claim.  Where a plural author is implied by the nature of the representations -- for instance, where, as here, (1) the alleged fraud is based on statements made in the offering materials and (2) the complaint gives grounds for attributing the statements to the group -- group pleading may satisfy the source identification required by Rule 9(b).  Following <u>Luce [v. Edelstein</u>, 802 F.2d 49 (2d Cir. 1986)], we hold that there is no fixed requirement in such circumstances to identify a single entity within the group on pain of dismissal.").

### b. Scienter

The Complaint adequately pleads Turano's scienter.  It plausibly alleges an agreement between the defendants and Turano's participation in the scheme, including knowingly approving false invoices, making affirmative misrepresentations as to the legitimacy of the invoices, and sharing in the resulting proceeds.  Moreover, Turano refused on June 10, 2013 to be questioned by Mintz Levin, and he acknowledged he was "sucked into stuff."  These allegations are more than sufficient to support a claim of Turano's bad faith.  <u>See</u> <u>Fuji Photo</u>, 640 F. Supp. 2d at 318 (allegations of fraudulent invoicing scheme sufficient to support inference of fraudulent intent by corporate insider who approved invoices); <u>Brooke v. Schlesinger</u>, 898 F. Supp. 1076, 1087 (S.D.N.Y. 1995)

("the allegations of affirmative misrepresentation in connection with the invoicing fraud give rise to a strong inference of fraudulent intent"); see also Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Turano's suggestion that he was merely negligent in approving the invoices, Turano Mem. 13, even if it could be asserted at this stage, is wholly inadequate to refute plaintiff's allegations.

### c. Actual and Justifiable Reliance

The Access defendants argue that plaintiff has not pled that it actually relied on any of their purportedly false representations, but only that it relied on the signatures of Albanese and Turano. Access Mem. 23. We reject this argument. Paying the invoices is amply sufficient to show actual reliance upon them. See Twenty First Century L.P.I.. v. LaBianca, 19 F. Supp. 2d 35, 39 (E.D.N.Y. 1998) ("It is undisputed that plaintiff paid each of the inflated invoices; therefore, plaintiff has established as a matter of law that it relied on defendants' fraudulent representations. Thus, the only remaining issue is whether such reliance was justified.") In addition, plaintiff adequately alleges that Weber and Weinstein are liable for Turano and Albanese's false statements as co-conspirators.

Further, we reject the Access defendants' suggestion that because Needham should have further scrutinized the invoices, it

41

did not justifiably rely on them.  Access Mem. 23–24.  In New York,
"[t]he proper test of reliance in a fraud case is not 'reasonable'
reliance, it is 'justifiable' reliance, a clearly less burdensome
test."  Gordon & Co. v. Ross, 84 F.3d 542, 546 (2d Cir. 1996).
Reliance on company's own employees to approve invoices in the
usual course of business is justifiable.  See Twenty First Century,
19 F. Supp. 2d at 39–40 ("Clearly, Twenty First Century's reliance
on its employees' (one of whom was an officer of the corporation)
approval of the vendors was justified. . . .  It is, therefore,
specious to suggest that someone else in the corporation should
have been able to look at the invoices and know 'by the exercise
of ordinary intelligence the truth' that they were irregular.").

### d. Contract Theory

Finally, the Access defendants argue that the Amended
Complaint contains an "[i]ntrinsic," "indirectly pleaded
contention" that an oral contract existed between Needham and the
Access entities, which forecloses a claim of fraud related to that
contract.  We disagree, principally because the Complaint alleges
just the opposite: that no contract existed.  Compl. ¶ 28.
Defendants' contract-based argument is therefore unavailing.

### D. Count Five: Breach of Fiduciary Duty

Count Five asserts a claim of "breach of fiduciary
duty/faithless servant" against Albanese and Turano.  New York's
faithless servant doctrine requires disloyal employees to forfeit

compensation received during period of disloyalty, regardless of damages to the employer.  Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003).  Such a claim also extends to the period in which a disloyal employee covers up his or her bad conduct.  Morgan Stanley v. Skowron, 989 F. Supp. 2d 356, 363 (S.D.N.Y. 2013).  Turano argues that this claim is time-barred. Turano Mem. 18-19.

Because the alleged breach of duty is based on a theory of actual fraud, the applicable limitations period is six years.[9]  See N.Y. C.P.L.R. § 213(8); Cohen, 711 F.3d at 361; Kaufman v. Cohen, 307 A.D.2d 113, 118, 760 N.Y.S.2d 157 (1st Dep't 2003) ("[T]he case law in New York clearly holds that a cause of action for breach of fiduciary duty based on allegations of actual fraud is subject to a six-year limitations period[.]").

"Under New York law, the limitations period for claims arising out of a fiduciary relationship does not commence 'until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated.'"  Golden Pac. Bancorp

---

[9]    In general, for claims of breach of fiduciary duty under New York Law, "the applicable limitations period depends on the substantive remedy that the plaintiff seeks[.]"  IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 139, 907 N.E.2d 268 (2009).  If a "purely monetary" remedy is sought, the claim is construed as alleging "injury to property" pursuant to N.Y. C.P.L.R. §214(4), and a three-year limitations period applies.  Id.  If equitable relief is sought, a six-year limitations period applies pursuant to N.Y. C.P.L.R. §213(1).  Id.  However, the more specific New York rule applicable in this context displaces the general default rule.  See Levy v. Young Adult Inst., Inc., 103 F. Supp. 3d 426, 434-35 (S.D.N.Y. 2015).  Therefore, we do not address the parties' arguments as to whether the remedy sought is monetary or equitable.

v. F.D.I.C., 273 F.3d 509, 518 (2d Cir. 2001) (quoting Westchester Religious Inst. v. Kamerman, 262 A.D.2d 131, 131, 691 N.Y.S.2d 502 (1st Dep't 1999)).  Misconduct alleged prior to the date on which fiduciary relationship is repudiated or terminated falls within the permissible scope of the claim.  Id. at 519.  Albanese's admissions and resignation occurred in February 2011; Turano's occurred in June of 2013.  Therefore, the breach of fiduciary duty claim, first brought in the Amended Complaint of September 25, 2015, is timely.

**E. Count Six: Unjust Enrichment**

Plaintiff's final cause of action is for unjust enrichment. We reject defendants' contentions that the claim is untimely or otherwise insufficiently pled.

**1. Timeliness**

The statute of limitations in New York for claims of unjust enrichment based on a theory of fraud is six years.  See N.Y. C.P.L.R. §§ 213(8); Golden Pac. Bancorp, 273 F.3d at 518; Loengard v. Santa Fe Indus., Inc., 70 N.Y.2d 262, 266, 514 N.E.2d 113 (1987).  "Under New York law, an unjust enrichment claim accrues upon occurrence of the wrongful act giving rise to the duty of restitution."  Plitman v. Leibowitz, 990 F. Supp. 336, 337 (S.D.N.Y. 1998).  Because the Complaint alleges wrongful acts of defendants after April 1, 2009, as least as to some of the fraudulent invoices, the unjust enrichment claim is timely.

## 2. Other Elements

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006) (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)).

Turano argues the Complaint does not adequately allege a direct benefit to him because the allegation that he received money procured from Needham is pled "on information and belief." Turano Mem. 21-22. Given the many details alleged about the scheme and Turano's participation in it, including his statement that he was "sucked into stuff," we find the allegation in the Complaint that Turano received proceeds from the scheme to be sufficient, particularly because, at this point, knowledge of specific payments between the defendants would be solely within defendants' possession. See Fuji Photo, 640 F. Supp. 2d at 318; Vento & Co. of N.Y. v. Metromedia Fiber Network, Inc., No. 97 Civ. 7751 (JGK), 1999 WL 147732, at *7 (S.D.N.Y. Mar. 18, 1999).

## F. Service of the Amended Complaint on Albanese

Defendant Albanese, proceeding pro se, asserts a claim under Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process. In considering the motion, the Court "must look to matters outside the complaint to determine whether it has

45

jurisdiction." Darden v. DaimlerChrysler N. Am. Holding Corp., 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002). The plaintiff bears the burden of making a prima facie case of proper service, through specific factual allegations and other supporting materials. Rankel v. Town of Somers, 999 F. Supp. 2d 527, 536 (S.D.N.Y. 2014). "If service of process was not sufficient, the Court has discretion to dismiss the action, but dismissal is not mandatory." Id. (internal quotation marks omitted).

Albanese alleges he was never served with a copy of the Amended Complaint after it was filed on September 25, 2015, and that he first learned of the Amended Complaint when he received a copy attached to defendant Turano's motion to dismiss. Albanese Mem. ¶ 2-3. Albanese otherwise joins his co-defendants' motions to dismiss. Id. ¶ 5. By declaration, plaintiff's counsel states that, having received Albanese's motion on November 12, 2015, he learned Albanese had not been sent the Amended Complaint "due to an administrative error," and that he served Albanese by certified mail that day. Decl. Of Matthew G. Coogan In Opp'n To Mot. To Dismiss By Glen Albanese ¶ 4, ECF No. 67; see also ECF No. 66 (affidavit of service). It is undisputed that Albanese was timely served with plaintiff's initial summons and complaint, see ECF No. 23, at 3 (affidavit of service), and that he wrote to the Court in early September acknowledging plaintiff's request to file an amended complaint on September 25 and expressing his "wish to

participate in this litigation," Ltr. of Sept. 2, 2015, ECF No. 42. In addition, we have fully considered his substantive arguments for dismissal, which are the same as those of his co-defendants.

Given that Albanese was served with the initial summons and complaint, that he was ultimately (albeit belatedly) served with the Amended Complaint, and that the late service of the Amended Complaint has not prejudiced his participation in this litigation, we decline to dismiss the claims asserted against him in the Amended Complaint on the grounds of deficient service of process.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss Counts One and Two as untimely is converted to a motion to summary judgment and denied, and the defendants' motions to dismiss are denied in remaining part. The parties are directed to confer and submit to the Court a proposed schedule for the resolution of this case. This Memorandum and Order resolves Docket Numbers 53, 57, and 65.

**SO ORDERED.**

Dated:    New York, New York
          August 12, 2016

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

47